411 So.2d 1127 (1982)
Armond J. EITMANN
v.
M. G. WEST.
No. 12571.
Court of Appeal of Louisiana, Fourth Circuit.
February 9, 1982.
Rehearing Denied April 16, 1982.
Ferdinand J. Kleppner of Grisbaum & Kleppner, Metairie, for plaintiff-appellee.
James H. Drury of Drury, Lozes & Curry, New Orleans, for defendant-appellant; Catherine Maureen Blackburn, New Orleans, of counsel.
Before REDMANN, SCHOTT and CIACCIO, JJ.
CIACCIO, Judge.
This is an appeal from a judgment of the Civil District Court which awarded damages to the plaintiff for injuries he sustained as a result of certain alleged intentional tortious actions of a fellow employee. We reverse that decision.
Plaintiff, Armond J. Eitmann, filed an action for damages against defendant, M. G. West, his former supervisor at New Orleans Public Service, Inc. The suit was based upon the supervisor's alleged willful refusal *1128 to allow the plaintiff to take required medication and treatment during working hours for a prior back injury that plaintiff had not completely recovered from on the date he was instructed to resume full time but modified duty.
The trial judge rendered judgment in favor of the plaintiff in the amount of five thousand dollars ($5,000), from which judgment the defendant filed this appeal.
The facts as disclosed by the record are as follows: The plaintiff was employed as a lineman for New Orleans Public Service, Inc. (NOPSI). His duties required him to install crossarms on utility poles, set poles, run cross wires, and connect wiring to the insulators on the crossarms and onto the poles. He was injured on February 17, 1976 while attempting to lift several spans of aluminum wire to be installed onto a utility pole, at which time he experienced severe pains in his back and legs. He was treated by the company physician, Dr. Charles Peterson, who diagnosed his injuries as muscle sprain. Dr. Peterson prescribed analgestic medications and the application of local heat. Dr. Peterson subsequently referred plaintiff for examination and treatment by Dr. Harold M. Stokes, an orthopedic specialist.
Dr. Stokes examined the plaintiff on March 10, 1976, found no evidence of nerve root compression or irritation in the lumbar region, expressed his approval of the conservative treatment involving analgesic medications and the application of local heat and expressed the opinion that, as plaintiff's symptoms subsided, he could be returned to his regular work at Dr. Peterson's discretion.
Dr. Stokes' written report dated March 10, 1976 was mailed to Dr. Charles W. Peterson, Jr. at his NOPSI medical office. No copy of this report or of the numerous medical reports of other doctors introduced in the record indicate that any copies were mailed to the defendant. On direct examination, defendant testified that he never received copies of any medical reports as they were either forwarded directly to the company physician or to the claims department.
Despite treatment, plaintiff's complaints persisted. On August 20, 1976 Dr. Peterson referred plaintiff to the offices of Dr. A. Correa and Dr. R. C. Llewellyn, neurosurgeons, for additional examination and/or treatment. Dr. Correa rendered a report on September 13, 1976, addressed to Dr. Peterson at NOPSI's office, reaffirming that plaintiff was probably suffering from a cervical and lumbo-sacral sprain with the low back giving him the most discomfort. He recommended that plaintiff be hospitalized for an initial trial of conservative treatment to include physical therapy and pelvic traction and further indicated that the plaintiff might require a myelogram to rule out the possibility of disc herniation if he did not respond to this conservative treatment. A subsequent myelogram disclosed that plaintiff was suffering from a double ruptured disc.
Dr. Llewellyn operated on the plaintiff on September 10, 1976 and performed a discectomy of L-4 and L-5 to repair the disc ruptures. Dr. Llewellyn became the treating physician for plaintiff subsequent to the operation and routinely rendered medical reports addressed to Dr. Peterson, to plaintiff and to Dr. Louis Oms, a personal physician apparently selected by plaintiff. The exhibits indicate that copies of some of the reports were sent to Mr. T. K. Schimpf, an employee in the claims department of NOPSI, but none of the copies were forwarded to defendant.
From January 27, 1977 through May 20, 1977 upon the instructions of Dr. Llewellyn, the plaintiff returned to a modified job assignment. He was instructed not to squat, climb, or lift. He was encouraged by his surgeon to walk, sit, and drive. He was told to use moist heat and rest periods after work, while at home, and during the day if the work schedule permitted it.
On May 4, 1977 the NOPSI claims department sent the plaintiff to be reexamined by the orthopedist, Dr. Harold Stokes. In a report dated May 5, 1977 addressed to NOPSI, attention T. K. Schimpf, Dr. Stokes stated, "It is my opinion that this patient *1129 should not be doing any work which requires any bending, stooping or heavy lifting. I believe he can be doing sedentary work or work which involves alternating sitting, standing or walking."
In a postscript to his report Dr. Stokes advised NOPSI that plaintiff wanted copies of the medical report sent to him and to Dr. Llewellyn, and that he had advised plaintiff to contact Mr. Schimpf at NOPSI for the copies as it was against the policy of Dr. Stokes to release reports directly to patients.
On May 17th Dr. Stokes sent a letter to Mr. Schimpf confirming a telephone conversation of May 16th wherein he stated that plaintiff "can be doing eight hours of work daily provided he conform to the restrictions specified in my letter of May 5, 1977." The restrictions in the report of May 5th have been previously cited herein. Neither the report of May 5th nor the letter of May 17th made any reference to medication or the necessity for plaintiff to take hot soaks during work hours.
No other addressees appear on the report and letter other than Mr. Schimpf. Mr. Schimpf did not testify at the trial, although he was subpoenaed, and it was stipulated that his absence was due to his being hospitalized at the time of the trial.
On May 20, 1977, the plaintiff was instructed by Dr. Peterson to return to an eight hour work day of modified duty, and Dr. Peterson signed a work authorization form which was required by NOPSI in order for plaintiff to be assigned to full time work status. The plaintiff complained to Mr. Schimpf of the NOPSI claims department that the form made no provision for him to take medication during his eight hour work day or to take hot soaks during the work day.
On this day, the plaintiff was sent by the claims department to the office of the defendant. In conversation with the defendant, the plaintiff objected to being sent back to work for an eight hour day without allowance being made for him to take his hot baths and plaintiff also claims he discussed the omission of mention of his need for medication but defendant denies discussing same. The defendant consulted telephonically with Dr. Peterson and was advised that the plaintiff could take his hot soaks after work. The plaintiff was then instructed to report to work. Defendant testified that at this time he did not know the plaintiff was taking medicine. He denied that he had threatened to fire the plaintiff or that he became angry with the plaintiff.
The plaintiff worked four eight hour days without incident. He took his medication and hot soaks after work. On the fifth day, May 26, 1977, plaintiff, while driving a 1½ ton truck, struck several bad spots in the street causing plaintiff to be jolted about in the truck. This produced back pains and a jumping feeling in plaintiff's legs. Plaintiff drove his truck to the main office of NOPSI and sought out Dr. Peterson although plaintiff did not have an appointment to see him. Plaintiff described his present symptoms and complaints and protested his inability to take medication during working hours. Accordingly, Dr. Peterson immediately wrote a new work slip for plaintiff authorizing the plaintiff to take medication while on modified duty. Dr. Peterson's remarks on the work slip were: "Modified dutyeight hours per day. Should not be driving. Can take medication while working." This work slip, (Exhibit D-3), and the earlier one, (Exhibit D-2), is a form called "Disposition of Industrial Injury" from the medical department of NOPSI and both were addressed to Mr. L. C. Ramon, Jr. of the NOPSI claims department.
Mr. Eitmann returned with the new form to see Mr. West in his office. While in the office he collapsed and was taken by police emergency unit to Baptist Hospital. He was transferred to Montelepre Hospital where he remained for nine days. While in the hospital he was given medicine, compresses, back rubs and therapy. The plaintiff was released to convalesce at home on June 3, 1977. His condition was diagnosed as severe back spasm with secondary hyperventilation which resulted from extreme *1130 pain and agitation. While at home the plaintiff was given pain pills, muscle relaxants and hot baths.
The defendant-appellant argues that his actions did not constitute an "intentional act" within the legal sense in which that term is utilized, as an exception to the exclusive remedy rule of the Louisiana Workmen's Compensation statute. LSA-R.S. 23:1032. The appellant further argues that the district court judgment is not supported by the facts.
Under the Louisiana Workmen's Compensation Statute an employee is entitled to compensation for an accident or illness arising out of and in the course of his employment. LSA-R.S. 23:1031 et seq. An "accident" is defined as "an unexpected or unforeseen event happening suddenly or violently, with or without fault and producing at the time objective symptoms of an injury". LSA-R.S. 23:1021(1). The rationale' behind the existence of the Workmen's Compensation provisions is a compromise between the employer and employee. The employer gives up the immunity against liability which he otherwise would enjoy in all cases where he was without fault; in exchange, the employee loses his right of full damages for his injury and accepts instead a limited sum by way of compensation. Malone, Louisiana Workmen's Compensation, Sec. 361 (1951); Courtney v. BASF Wyandotte Corp., 385 So.2d 391 (La. App. 1st Cir. 1980), writ den., 386 So.2d 359 (1980). The exclusive remedy provision of the Louisiana Compensation Act prevents the employee from seeking recovery in tort for an injury sustained in the course and scope of his employment, which injury was negligently caused by his co-employee or employer. L.S.A.-R.S. 23:1032. Bazley v. Tortorich, 397 So.2d 475 (La.1981); Pflieger v. Haws, 180 So.2d 892 (La.App. 1st Cir. 1964), writ den., 248 La. 908, 182 So.2d 661.
There are two exceptions to the rule that compensation is the employee's exclusive remedy against a fellow worker or employer, that is: (1) those injuries occasioned by the intentional acts of a fellow worker or employer and (2) those injuries which occur outside the course and scope of the employment. Intentional Act: Bazley v. Tortorich, supra; Guidry v. Aetna Casualty & Surety Company, 359 So.2d 637 (La. App. 1st Cir. 1978), writ den., 362 So.2d 578; Course and Scope: Waggoner v. Kellog-Moore Oil Co., Inc., 375 So.2d 197 (La.App. 2nd Cir. 1979).
An "intentional act" within the meaning of the Louisiana workmen's compensation laws has been construed to mean the same as an "intentional tort" in reference to civil liability. LSA-R.S. 23:1031 et seq. Bazley v. Tortorich, supra at p. 480.
The Louisiana Supreme Court has defined the test for determining "intent":
The meaning of "intent" is that the person who acts either (1) consciously desires the physical result of his act, whatever the likelihood of that result happening from his conduct; or (2) knows that that result is substantially certain to follow from his conduct, whatever his desire may be as to that result. Bazley v. Tortorich, supra at p. 481. Restatement of Torts 2d (1965); W. Prosser, Law of Torts 4 ed. at pp. 31-32 (1971).
The meaning of "intentional act" within the framework of the Louisiana compensation statutes exclusive remedy rule has been found, by the Supreme Court, to fit a disjunctive criteria. The Supreme Court explained:
"The meaning of intent in this context is that the defendant either desired to bring about the physical results of his act or believed they were substantially certain to follow from what he did." ... (Emphasis supplied). "Intent is not, however, limited to consequences which are desired. If the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result. Restatement (Second) of Torts, 8A, Comment; Prosser, supra, 8)" Bazley v. Tortorich, supra at p. 482.
An "act" as used in this context means "an external manifestation of the actor's *1131 will which produces consequences." Bazley v. Tortorich, supra at p. 481.
A review of the record in this matter convinces this Court that there is absolutely no evidence to show that the defendant's actions towards the plaintiff were motivated by a conscious desire to cause injury to plaintiff, nor does plaintiff's petition contain any allegations that his co-employee desired to produce the consequences of his acts or believed that injury to the plaintiff was substantially certain to follow his acts. Nor did plaintiff at any time during direct or cross examination assert that the defendant desired to injure him or that defendant knew that injury to plaintiff was substantially certain to result from the orders given by defendant.
There is no dispute that the plaintiff was reexamined by an orthopedist, Dr. Harold Stokes, and interviewed by Dr. Charles Peterson. There is, likewise, no dispute that the defendant had received Dr. Peterson's report which directed the plaintiff to return to an eight hour work day of modified duty and that he had checked with Dr. Peterson by telephone to verify the doctor's findings regarding plaintiff's condition on the day that the plaintiff was instructed to return to full time duty. This Court concludes that the defendant was relying upon these expert medical opinions, albeit erroneous, when he directed the plaintiff to return to work, without making provision for him to take his medicine and hot soaks during the work day.
Apparently, the claims department of NOPSI felt that plaintiff was exaggerating his condition and had monitored his activities prior to the reexamination by Dr. Stokes. Plaintiff had been observed working on the repairs of a mini-bike at his home and assisting in moving furniture and boxes into a new house. West had some knowledge of this. Although defendant may have concluded that plaintiff was exaggerating his symptoms, defendant took no action to order plaintiff to return to full duty until he received the written authorization from Dr. Peterson dated May 20, 1977 (defendant's Exhibit 2) which specifically authorized plaintiff to "Return to modified dutyeight hours per day. No lifting or straining." This report contained no information as to medication or the need for plaintiff to be allowed to take hot soaks during working hours and Dr. Peterson gave no further instructions to defendant regarding these two matters when defendant called Dr. Peterson regarding same on May 20, 1977. Defendant testified that company procedures prohibit the taking of medication under circumstances where the effects of the medication might be dangerous to the safety of the employee or his co-workers, thus, the rule requiring specific medical authorization for the taking of medication while driving a vehicle or performing other hazardous duty. Assuming, arguendo, that defendant exercised poor judgment in making no further inquiry of Dr. Llewellyn or any other physician, such action would be negligence covered by the Workmen's Compensation Law and would not expose defendant to tort liability.
The reasoning and conclusions of the lower court, that the defendant committed an "intentional act" are erroneous. The lower court did not have the benefit of the lucid Supreme Court opinion in Bazley v. Tortorich, supra, when it decided the instant case.
In its reasons for judgment, the trial court set forth its theory of liability:
However, the evidence indicates that Mr. West did indeed have personal knowledge of the plaintiff's condition, but that he elected to force plaintiff back to work under conditions which could reasonably be expected to produce injury. (Emphasis supplied) Reasons for Judgment, P. 4.
The test for determining liability is not whether the defendant acted with a "reasonable expectation", but rather whether he acted with a "substantial certainty", or with a conscious desire for the results. In this case, the trial court erroneously applied the criteria for determining liability which results from negligence.
*1132 The evidence does not support a finding that this defendant consciously desired the physical results of his actions, nor does it support a finding that the defendant knew that the results were substantially certain to follow from his actions.
The trial court erred in its conclusions that the defendant's actions constituted an intentional act and in awarding damages to the plaintiff.
The judgment of the Civil District Court for the Parish of Orleans is therefore reversed. Judgment is hereby entered in favor of the defendant, M. G. West, and against the plaintiff, Armond J. Eitmann. Costs are to be levied against the plaintiff-appellee.
REVERSED.