573 So.2d 533 (1991)
Susan Leonard WILLIAMS, et al.,
v.
GERVAIS F. FAVROT CO., INC., et al.
No. 89-CA-1929.
Court of Appeal of Louisiana, Fourth Circuit.
January 7, 1991.
Writ Denied March 8, 1991.
*534 Charles A. Verderame, Giraud, Cusimano & Verderame, New Orleans, for plaintiffs/appellants.
René A. Curry, Jr., Curry & Blankenship, New Orleans, for defendants/appellees, Gervais F. Favrot Co., Inc. and Fidelity and Guar. Ins. Co.
Kevin O'Bryon, Leake & Andersson, New Orleans, for defendants/appellees, H & W Steel Erectors, Inc. and Travelers Ins. Co.
Bernard S. Dolbear, Law Offices of James J. Morse, New Orleans, for intervenor/appellant, Travelers Ins. Co.
Before SCHOTT, C.J., and BARRY and BECKER, JJ.
BARRY, Judge.
Mrs. Susan Williams appeals the dismissal of her lawsuit which was based on the intentional tort exception to the Louisiana Worker's Compensation Act.
On October 14, 1984 plaintiff's husband, Leon (Skipper) Williams, was employed as a steel worker by H & W Steel Erectors [H & W]. Gervais F. Favrot Co., Inc. [Favrot], a general contractor, hired H & W to perform steel work for construction of a building on Poydras St. owned by Westminster Center Properties [Westminster]. Williams and Ronald Spiers were setting steel rebar cages on the twenty-second level when they fell to their deaths. Mrs. Williams, individually and on behalf of her minor daughters, sued Westminster, Favrot, their insurers, and others based on negligence.
*535 Mrs. Williams also sued H & W and Favrot based on the intentional acts of their employees in instructing and ordering Williams to work on a dangerous structure which they knew was not properly braced. Various third party demands were filed. Travelers Insurance Company, the compensation carrier for H & W, intervened to recover funeral expenses and compensation benefits. Several voluntary dismissals and summary judgments were granted.
Favrot, H & W, and Westminster filed for summary judgments. H & W's motion was denied and this Court refused writs (No. C-5290, April 2, 1986). The trial court granted summary judgment to Westminster and a partial summary judgment to Favrot as to the negligence claim, but retained the intentional tort claim. This Court affirmed. 499 So.2d 623 (La.App. 4th Cir.1986), writ denied 503 So.2d 19 (La.1987).
After trial the court dismissed the intentional tort claims against Favrot and H & W. Plaintiff submits that the trial court failed:
1) to declare La.R.S. 23:1032 unconstitutional to the extent that its interpretation and application allow an immunity for the use of such a dangerous procedure;
(2) to interpret "intentional act" to encompass the conscious knowing and deliberate decision to use a dangerous method which created a substantial risk of death and constituted gross violations of OSHA regulations;
(3) to adopt the interpretation of intentional act in La.R.S. 14:94 as the standard in employer/employee relationships;
(4) to find an intentional act on the part of the statutory employer/general contractor for breaching its subcontract and forcing the subcontractor to use a highly dangerous method;
(5) to award damages.

TESTIMONY
Douglas Boudreaux, Favrot's superintendent, testified that he utilized the same procedure for construction of the exterior column on the first twenty-one floors of the structure. H & W ironworkers (whose supervisor was William Gilmore) stood on the slab, guided the steel rebar cage (approximately 26" by 26") over dowels which protruded two to three feet up from the slab. The steel rebar cage was a network of vertical steel rods tied together with horizontal bands and designed to become the interior reinforcement for a vertical concrete column. The workers reached inside the cage and "tied off" the cage with wire to the dowels. The H & W workers climbed up the 12 foot cage after it had been tied off and unhooked the crane.
At that point Favrot carpenters (foreman was Lester Bonnano with Walter Lucas substituting the day of the accident) took over. They lowered the column form into place around the rebar cage, (forms were 8 or 12 feet in height and consisted of plywood panels of 4 or 8 feet placed into a metal frame) then lined it up within the template. The template was a wooden two by four nailed or bolted into the slab on three sides of a square which overlapped the outer edge of the form. The form was very stable because of the secured cage inside, so the workers climbed the form to unhook the crane. The Favrot carpenters would brace (four braces of long metal pipes attached to two sides of the form and bolted to the slab) the form and the fourth side of the template was nailed down. Then concrete was poured into the form containing the rebar cage.
Boudreaux testified that a different approach was used to construct the twenty-second floor because of the roof. The rods on the top of the cage were flared out at an 90 degree angle on three sides which meant that the column form could not be guided down over the cage because it was top heavy and unstable. Boudreaux discussed several alternatives with the H & W general foreman, Bryan Gilmore, and Favrot's carpenter foreman, Lester Bonnano. One involved setting the column form first, bracing it, setting the cage, tying it down from the inside, then cutting the crane loose. Another alternative was to remove a panel of the column form (after it was set) in order to tie off the cage inside. *536 Either way the column form would be braced first.
According to Boudreaux, Gilmore stated that Favrot's carpenters usually climbed inside the cages to put in weld plates (a piece of flat iron with bolts positioned inside the cage) to which the exterior finish would be attached. Gilmore felt it would not be any more difficult to tie down the cage from the inside. Gilmore was concerned about the difficulty of reaching across the 26 inch cage to tie off the steel. Boudreaux testified that Bonnano was not at the October 4th discussion so he told Walter Lucas, Favrot's substitute foreman, how the procedure would be different.
Boudreaux told Lucas that he wanted the form set and braced before the cage was placed inside. Boudreaux was on the ground floor talking on the radio and was not an eyewitness to the accident. He denied the procedure was a "test" and admitted that he agreed with Gilmore's decision, but he emphasized that it was Gilmore's idea to set the column form first, then place the cage inside and tie it off.
Boudreaux understood that Spiers was inside the cage when it was lowered into the form and Williams was on top of the form guiding it when the form fell, but he declared that was not the agreed upon procedure. Boudreaux claimed that a worker was to guide the cage into a braced form and another worker would crawl over the top to tie off the steel inside. He admitted that the Favrot crane should not have lifted the cage with a worker inside, and the danger from an unbraced form should have been obvious to a carpenter foreman if he were watching. He conceded it was "very possible" to knock over an unbraced form.
Boudreaux testified that after both men died, a panel of the column form was pulled out and ironworkers tied the steel as they stood on the slab. The form was braced before the carpenters disconnected the crane, then the side panel was taken off and the cage lowered inside and tied off.
Donald Miller, the Favrot crane operator who placed the column, testified that he was not informed about a different procedure for the twenty-second floor. The morning of the accident he was told by radio to pick up the column form and place it on the edge of the twenty-second floor. The outer side was over the edge of the slab. The form was placed in template and unhooked without any brace to secure it. Williams, the H & W foreman, climbed to the top to unhook the crane. Williams called Miller and told him to pick up the cage. Spiers climbed into the cage and Miller raised it as Williams was climbing the form to guide the cage inside. Williams was standing on top of the form on the outside (the side without flared rebar rods) in order to signal to Miller to guide the form. Williams signaled for Miller to stop lowering the cage. Spiers unhooked the crane from the cage. Miller heard someone on the radio say that the procedure was working. A minute or two later the unhooked and unbraced form with the cage inside fell over the edge of the building.
According to Miller, Spiers must have unhooked the cage and Williams signaled to lift the hooks. As the crane started up Williams grabbed one of the cables and threw it out of the column. The cable looked as though it was going to bounce against the form so Miller stopped the crane. A splice nut hung up right underneath the top lip of the form. Williams grabbed it, moved it, and tried to push it away. When he pushed off the whole form went over.
Miller stated that OSHA regulations prohibit a worker from riding with a load. He stated that he had seen alternatives when the cage could not be set first. Workers could set the cage and then construct the forms around the cage. He noted that after the accident the procedure changed and one panel was removed from the already set and braced form. Then the cage was lowered and tied off by reaching through the open side.
William B. Gilmore, the H & W foreman who was Williams' direct supervisor, testified by deposition that Williams handled the work up top and he coordinated the job and ground work. Several days prior to the accident Boudreaux informed H & W *537 that the procedure for the twenty-second floor would be different. Gilmore stated that Boudreaux discussed a number of alternatives with one or two of Favrot's carpenter foremen, but Boudreaux made the final decision. The alternatives were building the form around the cage or placing the cage inside the form after a panel had been removed. Boudreaux decided that the column forms would be set first and braced, then H & W ironworkers would place the cage inside.
Gilmore denied telling Boudreaux that he preferred to put a worker inside the cage. He said it was better to remove a panel and have the worker stand on the slab and tie off the cage, but he did not make a decision on the procedure. Gilmore denied telling Boudreaux that he was concerned about a worker's ability to reach in to tie off the cage. He testified that it was dangerous to use the procedure that was followed. He said he did not have authority to choose the procedure or to direct Favrot's carpenters to remove a panel for access.
Gilmore denied telling Williams over the radio to set the column. Gilmore intended to stand the columns after he finished building the last form. He had informed Williams of his plan. Gilmore was finishing the last cage for that section (on the ground) when the accident happened. Gilmore claimed that he did not know who decided to put a worker in the cage, but he did not. He said Williams made the "up top" decisions. Gilmore was certain that he told Williams and Spiers the morning of the accident that he (Gilmore) would set the forms for the columns and for them to brace the forms. The braces were for safety and proper alignment. Gilmore stated that despite the fact that he was Williams' supervisor, Boudreaux could have given orders directly to Williams.
Gilmore said nobody knew what happened when the form fell. Miller, the crane operator, told him that the hook got caught under the lip of the form. He stated that after the accident the panels were removed and the form was braced (as ordered before the accident). He said bracing was not a major consideration on the lower floors.
By deposition Walter Lucas, the Favrot carpenter/foreman on the day of the accident, testified that Boudreaux and Gilmore talked the day before the accident about alternatives to work on the twenty-second floor's thirty-one exterior and two interior columns. Lucas did not recall whether he talked to Boudreaux. Lucas testified that Gilmore believed it would be easier to put the cage inside the column form and tie it off from the inside rather than remove the column panel. Lucas said Gilmore felt that the ironworkers might not be able to reach the cage. He did not recall any consideration of time constraints.
Lucas said it was decided to install a column form and then put the cage inside, but he did not say who made the final decision. He said one column form was to be placed that way as a test. Lucas stated that he never used that procedure on the lower floors, but had used a similar procedure on other jobs.
Lucas testified that the column form was set and his carpenters were nailing down the template. His crew unhooked the crane from the unbraced form and the ironworkers had taken over to insert the cage. He did not recall whether he gave special instructions for work on the twenty-second floor. No larger crew had been requested. On the lower floors bracing was done prior to pouring concrete. He said workers routinely climbed unbraced column forms; however, he conceded that the secured cage was already inside.
Lucas said no one knew what happened. He saw Williams at the top of the form and Williams said the procedure was working so he informed Boudreaux by radio. Only later did he find out that Spiers was inside the cage. Lucas was walking away when the form fell and he looked back when someone yelled. There was no safety net, but there was a two foot walkway on the perimeter of the building. A double row of 42 inch high rails were destroyed by the approximately 1500 pound column.
Michael Castjohn, a Favrot carpenter, testified that it was common procedure to *538 climb unbraced forms to unhook a crane, but forms were stable on a level slab. He overheard Boudreaux (whom he characterized as a "pusher") discussing the problems involved in setting columns on the twenty-second floor. He could not recall the other persons, but thought Gilmore took part. According to Castjohn, Boudreaux stated he did not want to brace the form and pull the panels because it would take too much time. Placement of panel hinges on the form was ruled out because it would ruin the square shape.
Castjohn said on the morning of the accident he joked with Williams about setting the columns. Williams said that "he thought it stunk, the procedure that they were going to use...." Castjohn suggested that Williams order someone else to do the job. Williams said that "he wouldn't have somebody else do what he wouldn't do" and walked off. Castjohn said that at the time of the accident Lucas was up top and Bowers and Green were nailing the template. Williams was near the top and the cage was already inside the form. He did not see what set the form in motion, but he saw it fall and Williams try to jump to the building.
Donald Monday, an H & W ironworker, testified by deposition that Lucas told him and Spiers that he needed a small man to climb into the cage. Monday heard Gilmore on the radio tell Williams to "set the column as quickto get it up there." Williams then talked to Spiers who climbed into the cage. The cage was raised and Williams climbed to the top of the form to steady it. The crane was unhooked after the cage was in place, but there were no braces on the form. Monday said it was the Favrot's carpenters' job to brace the form. He said Williams was a very safe foreman. Monday said after the accident the forms were braced and no worker was inside the cage.
Michael Atwood, an H & W ironworker, by deposition testified that he overheard Gilmore speak to Williams. Gilmore said that he would send up the cages as soon as he could and Williams should set them as quickly as possible. Atwood said he heard no discussion on a different procedure. Gilmore told him that prior to the accident there had been a discussion on alternative procedures, but Gilmore did not say why an alternative was not used. After the accident panels were removed to tie off the cages. He testified that H & W ironworkers could not have decided to remove the panels because that was Favrot's carpenters' responsibility.
Roger Daniels, H & W ironworker, testified that Williams was a very safe foreman. He stated that was the first time he worked on a job where the cage was inside an unbraced form. He agreed there was a "good chance" that the form would be knocked over.
David Littlejohn, Favrot crane operator, by deposition stated that Boudreaux changed the procedure for the twenty-second floor. Boudreaux told him that the column form was going to be set first and the cage would be placed inside. He testified that he never let a worker ride in a cage and never set a cage into an unbraced form. Littlejohn said that in order to guide the cage into the form Williams would have to stand on the outside edge of the form. He did not consider that a safe procedure.
Keith Green, Favrot carpenter, by deposition stated that he was not told to brace the form and was not given specific instructions. He saw the column fall.
Ernest Bowers, Favrot carpenter, testified by deposition that he was not on the twenty-second floor at the time of the accident. He was cutting weld plates and Lucas was there. He said the forms were not usually braced until the template was down. He stated that he often climbed on unbraced forms but they were secured by the tied-off inside cage. He said safety meetings were held for the carpenters.
Ira Williams, President of H & W, testified that he did not remember a discussion prior to the accident about possible procedures for the twenty-second floor. Boudreaux said that he had spoken to Williams and Gilmore about the situation.
Alvin Marks, a safety expert primarily in the operation of cranes, reviewed plaintiff's summaries of depositions. He testified *539 that placing a worker in a cage violated OSHA and ANSI standards. If the cage passed over a carpenter on a slab that was a violation. The first infraction would violate the general rules of the Crane Manufacturer's Association of America manual. The second infraction violated the Journeyman's Manual for Ironworkers.
Marks testified that the flared steel cage was top-heavy and presented an unstable arrangement when it was placed inside an unbraced form on the edge of a building with one side unsupported by the slab. A worker climbing the form made the procedure more unstable. Marks saw no reason why the form was not braced before the cage was placed inside. Photos showed four braces lying next to the template. Boudreaux testified that he had planned for the columns to be braced but he did not follow up. Marks concluded that the procedure was dangerous and an obvious hazard. Marks defined unsafe as a hazard that was not reasonably controlled. Importantly, he said there was nothing to indicate that anyone anticipated the accident.
Marks theorized two forces which could have caused the accident: (1) the unsupported cage which weighed between 2,000-3,000 pounds; (2) the crane hook which was lodged on the form and raised to give sufficient impetus.
Mrs. Williams testified as well as Philip Clesi, an actuary, and Jonathan Wood, an economist.
TRIAL COURT JUDGMENT
The trial judge concluded:
I am convinced Williams' death was not the result of an intentional tort. For purposes of this conclusion, I define `intentional' to include those unforeseen or unintended consequences substantially certain to follow from a conscious course of action.
Without question, the method chosen to erect the rebar cage and form was dangerous. Indeed, it was stupid. There was no reason why the form could not have been braced before the cage was lowered into it. But the accident was not substantially certain to occur. Had Spiers tied the cage onto the dowels before the sling was unhooked, the accident would likely have been avoided. Even with this additional mistake, the operation had at least an even chance of safe completion.
The trial judge resolved a number of disputed facts even though the conclusions were not essential to disposition of the case.
(1) QUESTION: Was it the decision of Gervais Favrot, H & W Steel Erectors, or both, that the panels would not be removed?
ANSWER: Supervisory personnel of both parties jointly agreed to try this method first.
(2) QUESTION: Was the fact that the form was not braced a cause-in-fact of the accident?
ANSWER: Yes.
(3) QUESTION: Who unhooked the cage from the crane?
ANSWER: Rolan [sic] Spiers.
(4) QUESTION: Was this a test procedure?
ANSWER: Yes.

SPECIFICATIONS 2 AND 4 INTENTIONAL ACT
The crucial question is whether the decision of Williams' employer H & W, and/or his statutory employer/general contractor Favrot, to utilize the unproven procedure was an intentional act under the exception to La.R.S. 23:1032B which provides:
Nothing in this Chapter shall affect the liability of the employer, or any officer, director, stockholder, partner, or employee of such employer or principal to a fine or penalty under any other statute or the liability, civil or criminal, resulting from an intentional act.
The original House bill which contained the exception included "deliberate" as well as intentional acts, but that failed. Two amendments in the House and two in the Senate which expanded the exception to gross negligence were rejected. Johnson, 14 La. Civil Law Treatise: Workers' Compensation *540 Law and Practice, § 365 (1990 Pocket Part).
Similar policy considerations are expressed nationwide and discussed by commentators:
Since the legal justification for the common-law action is the nonaccidental character of the injury from the defendant employer's standpoint, the common-law liability of the employer cannot, under the almost unanimous rule, be stretched to include accidental injuries caused by the gross, wanton, wilful, deliberate, intentional, reckless, culpable, or malicious negligence, breach of statute, or other misconduct of the employer short of genuine intentional injury. (Footnotes omitted).
* * * * * *
Even if the alleged conduct goes beyond aggravated negligence, and includes such elements as knowingly permitting a hazardous work condition to exist, knowingly ordering claimant to perform an extremely dangerous job, or wilfully failing to furnish a safe place to work, this still falls short of the kind of actual intention to injure that robs the injury of accidental character.
Larson, 2A Workmen's Compensation Law, § 68.13 (1989).
Since the intentional act exception was passed in 1976 many cases have interpreted its language. The jurisprudence has respected the legislature's policy decision and has narrowly interpreted the exception. In Bazley v. Tortorich, 397 So.2d 475, 480 (La.1981), the Supreme Court discussed the legislative policy behind the exception:
After considering broader penalties that would have provided double benefits for an employer's violation of a safety rule, failure to provide a safety device required by law, or gross negligence on the part of a supervisory employee, which caused injury, death or disease, Official Journal of the House of Representatives, June 4, 1976, H.B. 354, p. 20, our legislature chose to impose a sanction for intentional wrongs by making the exclusive remedy rule inapplicable to such acts.
The Court concluded that the words "intentional act" meant "intentional tort". "Act" was defined to denote an external manifestation of the actor's will which produces consequences.
The meaning of intent in this context is that the defendant either desired to bring about the physical results of his act or believed they were substantially certain to follow from what he did.
* * * * * *
Intent is not, however, limited to consequences which are desired. If the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result. (Citations omitted)
397 So.2d at 482. The actor need not intend to inflict the actual damage. If he intends to inflict some harmful contact, he is then liable for the resulting harm which he did not intend. All intended wrongs must be inflicted without the consent of the victim. Fricke v. Owens-Corning Fiberglas Corporation, 571 So.2d 130 (La. 1990).
Mere knowledge and appreciation of a risk does not constitute intent. A defendant who believes that he is causing an appreciable risk of harm to another may be negligent and if the risk is great enough his conduct may be characterized as reckless or wanton, but it does not constitute an intentional wrong. The distinction between intent and negligence is a matter of degree. The line has been drawn where the known danger ceases to be only a foreseeable risk and becomes a substantial certainty. Knox v. Pelias, 522 So.2d 715, 718 (La.App. 5th Cir.1988), quoting Prosser, Law of Torts, § 8 (4th ed. 1971).
In defining "substantially certain" our Court has noted a significant difference between whether a fact is substantially certain or reasonably probable. Certain is defined as inevitable or incapable of failing, while probable deals with facts that arise from fairly, though not absolutely adequate, convincing, conclusive, intrinsic or extrensic evidence. Jacobsen v. Southeast Distributors, Inc., 413 So.2d 995 (La.App. 4th Cir.1982), writ denied, 415 So.2d 953 *541 (La.1982). See Hood v. South Louisiana Medical Center, 517 So.2d 469 (La.App. 1st Cir.1987). The language moves from the realm of possibility or risk which are negligence terms and expresses the concept that an actor with a substantial certainty cannot be believed if he denies that he knew the consequences would follow regardless of his subjective desire. Johnson, Workers' Compensation: The "Intentional Act" Exclusion, 42 LA.L.REV. 630, 633 (1982).
Cases illustrate how strong the link must be between the defendant's "intentional" conduct and the plaintiff's injury. Gross negligence does not meet the test. Gallant v. Transcontinental Drilling Company, 471 So.2d 858 (La.App. 2d Cir.1985). Allegations of deficiently designed machinery and disregarding OSHA safety provisions are insufficient. Cortez v. Hooker Chemical and Plastics Corporation, 402 So.2d 249 (La.App. 4th Cir. 1981).
The allegation that an employee's death could be reasonably anticipated does not state a cause of action under the exception. Bazley's "substantial certainty" language might be restated as "virtually sure" or "nearly inevitable." Reagan v. Olinkraft, 408 So.2d 937, 940 (La.App. 2d Cir.1981), writ denied 412 So.2d 1095 (La. 1982).
Allegations of failure to prepare or to use safety devices or failure to comply with regulations are not sufficient to prevent a summary judgment. Erwin v. Excello Corporation, 387 So.2d 1288 (La.App. 1st Cir.1980), writs refused 396 So.2d 1242 and 397 So.2d 1363 (1981). A general contractor's failure to take proper safety measures when work was in close proximity to energized wires (a carpenter was electrocuted) was not considered an intentional act to overturn a directed verdict. Snow v. Gulf States Utilities Company, 492 So.2d 31 (La.App. 1st Cir.1986), writs denied 496 So.2d 349, 356 (La.1986). We find no clear jurisprudential trend to liberalize the "intentional tort" definition.
Two opinions cited by plaintiff, Williams v. Ingredient Technology Corporation, 470 So.2d 283 (La.App. 5th Cir.1985) and McDonald v. Gonzales, 479 So.2d 9 (La. App. 5th Cir.1985), involve reversals of summary judgments when there were unresolved issues of material fact as to whether the defendant was substantially certain that the injury would result from his actions. In Thorning v. Shell Oil Company, 522 So.2d 558 (La.1988), a Supreme Court per curiam reversed summary judgment because there remained a genuine issue of material fact as to whether the defendant oil company knew that injury was substantially certain to result if the plant continued to operate without changes. In this case a trial was held and Mrs. Williams presented extensive evidence and exhibits.
Many opinions have affirmed summary judgment on the "intentional act" issue under slightly different factual circumstances. In Taylor v. Metropolitan Erection Company, 496 So.2d 1184 (La.App. 5th Cir.1986), writ denied 497 So.2d 1388 (La.1986), the plaintiff alleged that he fell from a scaffold because his supervisor intentionally failed to provide a safety belt despite repeated requests and plaintiff was required to work on a dangerous makeshift scaffold. Relying on Jacobsen, 413 So.2d at 995, the Fifth Circuit affirmed summary judgment.
In Davis v. Southern Louisiana Insulations, 539 So.2d 922 (La.App. 4th Cir.1989), our Court affirmed summary judgment where the plaintiff alleged the employer knew or should have known that employees were likely to injure themselves by performing work without proper equipment including ladders and scaffolding, which the employer failed to provide. This Court found that the conclusory petition statements and the deposition testimony did not create a genuine issue of material fact as to an intentional act.
This Court has also reversed judgments after trial. After testimony that a supervisor (relying on an erroneous medical report) directed plaintiff back to work without providing for medication or hot soaks, the trial court awarded damages. This Court reversed and noted that the court's *542 conclusion that the conditions "could reasonably be expected to produce injury" did not meet the Bazley test. Eitmann v. West, 411 So.2d 1127 (La.App. 4th Cir. 1982), writ denied 415 So.2d 951 (La.1982).
In Jacobsen, 413 So.2d at 995, plaintiff testified that his supervisor refused to supply him with a safety line and a plywood cover for the adjoining roof. This Court reversed the damage award and concluded there was no scintilla of evidence that the supervisor intended for plaintiff to sustain injury or that it was substantially certain that the consequences would follow.[1]
The Supreme Court has found an intentional tort in isolated cases such as Caudle v. Betts, 512 So.2d 389 (La.1987). There the employer's chief executive officer chased an employee after shocking him with a charged electric auto condenser (horseplay at a Christmas party) and the traditional intentional tort of battery was committed. See generally Dycus v. Martin Marietta Corporation, 568 So.2d 592 (La. App. 4th Cir.1990), writ denied 571 So.2d 649.[2]
Most Louisiana cases fall within "gross negligence" where the conduct falls far short of knowledge to a substantial certainty of harmful consequences. Appellate courts have consistently restricted a plaintiff worker to compensation. Louisiana's statute is broad compared to some states. Total escape from the compensation scheme was selected for commission of an intentional act rather than a percentage increase in compensation. Judicial broadening of the intentional tort concept would do serious damage to the exclusivity of the Compensation Act. See Johnson, La.Civil Law Treatise, § 365.
The trial judge concluded that the method chosen to set the column form and the cage was "dangerous" and "stupid". On reflection that conclusion may be generous. The trial court decided that supervisory personnel of H & W and Favrot agreed to try the new procedure, despite Boudreaux and Gilmore blaming each other. The testimony about discussions and possible alternatives indicates that both supervisors and Lucas were part of the decision process. There were less dangerous but time-consuming alternatives. According to Castjohn, Williams was not satisfied with the choice. However, there was testimony that the form was to be braced prior to placing the cage inside, a procedure not carried out by Williams and Lucas. None of that testimony can be interpreted to mean that the supervisory personnel of H & W or Favrot adopted a procedure that would intentionally cause personal injury. The supervisors did not intend that the form would fall and Spiers and Williams would be killed, nor did they desire that result. They clearly did not believe those consequences were substantially certain to follow. No specific intentional tort, such as battery in Caudle v. Betts, 512 So.2d at 389, has been alleged.
The procedure has been described as stupid, but it does not meet our jurisprudential parameters of an intentional tort. The trial court correctly concluded that this horrible accident was not substantially certain to follow. Specification 2 has no merit.
Since we find no intentional tort, Specification 4 also lacks merit.

SPECIFICATION 3

ADOPTION OF CRIMINAL STANDARD
Plaintiff argues that the definition of an "intentional act" in La.R.S. 14:94 should be adopted in substance and in spirit as the appropriate standard in the context of the employer/employee relationship. La.R.S. 14:94A provides that "[i]llegal use of weapons or dangerous instrumentalities is the intentional or criminally negligent discharging of any firearm, or the throwing, placing, or other use of any article, liquid, or substance, where it is foreseeable *543 that it may result in death or great bodily harm to a human being."
Reasoning that criminal laws prohibit conduct in a harsher and more severe manner than civil law, plaintiff argues that the commission of identical intentional conduct should at least meet the sanction of money damages under civil law and fit the exception of R.S. 23:1032 if the person could be sent to prison. Plaintiff submits that R.S. 14:94 is broader in its foreseeability standard than the literal language of Bazley v. Tortorich, 397 So.2d at 475. Plaintiff argues that immunity under R.S. 23:1032 rather than the exception should be narrowly construed and the criminal standard should be applied. Plaintiff cites no case law.
There is no logic to single out one phrase of a criminal statute. Our Supreme Court and appellate courts have interpreted and defined the exception under La.R.S. 23:1032. We have no basis to look to the criminal code, nor an isolated criminal statute, to re-formulate the well established jurisprudential definition.
This argument has no merit.

SPECIFICATION 1 CONSTITUTIONALITY
Plaintiff argues that La.R.S. 23:1032 which grants immunity for the employer's conduct is unconstitutional. She argues that a very narrow construction of the term "intentional act" with a corresponding broad immunity renders the statute unconstitutional. Citing La. Const. Art. I § 2, 3 and 22 as well as U.S. Const. Amends. V and XIV, plaintiff alleges that a claimant has a vested right to life, liberty, individual dignity and the right to earn a living.
Plaintiff claims a due process violation and argues that the employer's immunity is not an appropriate governmental objective. She submits there is no basis to allow employers to be immune from intentional conduct, or violations of OSHA regulations and accepted industry safety standards, and other actions that knowingly create a substantial risk of death and great bodily harm. She alleges no governmental purpose is served and the legislative purpose behind La.R.S. 23:13 which provides that an employer shall furnish reasonably safe employment is totally thwarted.
On equal protection grounds plaintiff argues that workers whose employers deliberately and consciously choose to ignore safety regulations and employers who provide a safe place have the same immunity. She argues there is no rational basis or valid public policy to immunize all employers.
Although defendants respond that plaintiff's constitutional challenges were not before the trial court, plaintiff's Suggested Areas of Inquiry for Findings of Fact and other memoranda in the trial court argued that the "intentional act" statute was unconstitutional (all grounds were not specifically pleaded).
La.R.S. 23:1032 as amended in 1976 (focus on the bar of negligence suits against co-employees and officers) has been held constitutional under due process, equal protection, and access to court attacks. See Bazley v. Tortorich, 397 So.2d at 475; Branch v. Aetna Casualty and Surety Company, 370 So.2d 1270 (La.App. 3rd Cir. 1979), writ denied 374 So.2d 660 (La.1979); Tobin v. Jacobson, 369 So.2d 1161 (La.App. 4th Cir.1979); Perez v. Continental Casualty Company, 367 So.2d 1284 (La.App. 3rd Cir.1979), writ denied 369 So.2d 157 (La.1979).
Plaintiff couches her arguments in terms of the interpretation of the "intentional act" exception. The above discussion on Specification 2 clearly shows the exception reflects unequivocal legislative intent. The legislature painstakingly decided not to include gross negligence or violations of statutes or safety regulations in its definition of an intentional act. That exclusion to the exclusive remedy rule is reasonable in relation to its goal and rationally furthers it.
We find no merit in plaintiff's constitutional claims.

SPECIFICATION 5 AWARD
The specification as to damages is pretermitted.
*544 The judgment is affirmed.
AFFIRMED.
SCHOTT, C.J., concurs.
SCHOTT, C.J., concurring:
The principal issue in this case is whether plaintiff proved by a preponderance of the evidence that her husband's death was the result of the intentional act of one or more of the employees of Favrot and H & W. The record supports the trial court's finding that the cause-in-fact of the accident was the fact that the form was not braced prior to the insertion of the rebar cage within the form and prior to the decedent's standing on the form. Thus, the question is whether the failure to brace the form was an intentional act.
The individuals involved in the plans for the construction of the exterior columns on the twenty-second floor were Favrot's superintendent, Boudreaux, H & W's superintendent, Gilmore, and Favrot's carpenter foreman, Bonnano. Those principally involved in the execution of the plan was another of Favrot's carpenter foremen, Lucas, and the decedent, Williams.
The preponderance of the evidence, indeed the only evidence, of the plan adopted by Boudreaux, Gilmore and Bonnano was to brace the form before the cage was inserted. Had this plan been carried out the accident would not have occurred. Consequently, with all due respect for the trial judge and my colleagues, the method chosen to do the job was not necessarily dangerous or stupid because the method chosen was not the one carried out and it did not cause the accident.
The cause of the accident was the failure on the part of the individuals involved to execute the chosen plan. The record does not establish what went wrong, but it was either because of a failure on Boudreaux's part to communicate the instructions to Lucas, a failure on the part of Gilmore to communicate with Williams, or the failure on the part of Lucas and Williams to carry out the instructions given them if such was the case.
Assuming that Boudreaux failed to instruct Lucas to brace the form before the cage was inserted the question becomes whether this failure was an intentional act. To be such we must assume that Boudreaux intentionally withheld the instructions knowing that it was substantially certain that, as a result, the form would fall off the building and the two men would be killed. Nothing in the record supports such a conclusion. The same must be said with respect to the possible failure on the part of Gilmore to communicate with his man, Williams.
Next, we must consider whether Lucas committed an intentional tort causing the accident. From his deposition it seems highly probable that Lucas did not know or understand that he had to brace the form before the cage was inserted. He spoke of his procedure on all of the floors below when hundreds of columns were constructed and when the bracing of the forms followed the installation of the cages; and the implication is that he was not told or did not understand why this procedure had to be changed on the top floor. If this had been the case it cannot be argued that Lucas committed an intentional tort by failing to brace the form first.
Strongly supporting the conclusion that Lucas was not given the necessary instructions is that the meeting with Boudreaux and Gilmore was attended by Bonnano who, at that time, was Favrot's carpenter foreman and who would have been in charge of the work on the twenty-second floor except for the fact that he went on vacation the day of the accident which resulted in Lucas's taking charge. Perhaps Boudreaux assumed that Bonnano would execute the plan or would, at least, convey the instructions to Lucas. Perhaps such an assumption constituted negligence but could hardly be classified as an intentional act.
The only other possibility is that Lucas knew he was supposed to brace the form and failed to do so. If this had been the case I cannot conclude that Lucas intentionally did this knowing that the accident was substantially certain to occur.
*545 Plaintiff established that the defendants violated several safety regulations by allowing Spiers to be inside the cage when it was hoisted by the crane. But this did not cause the accident. Had the form been braced the accident would not have occurred. Plaintiff also established that defendants were derelict in failing to have a safety net in place. But his was not a cause of these deaths because the net could not have withstood the momentum of the form and the cage falling with the men.
This was a terrible tragedy. Defendants were charged with an extremely heavy duty to safeground their employees who were working under extremely dangerous conditions. The record shows that one or more of these employees breached that duty to these two men. But it does not show that any of defendants' employees committed an intentional act as this has been defined by the courts so as to provide plaintiff with a remedy over and above that provided by the Worker's Compensation Law.
NOTES
[1] In a concurrence in Jacobsen, 413 So.2d at 999, the author of this opinion reflected on the harsh statutory reality:

The exclusive remedy rule, though harsh and restrictive, is a fact of life subject to change through the legislative process. In the meantime, seriously injured workers, such as the plaintiff, are relegated to the confines of the compensation statutes.
[2] The author of this opinion disagrees with the reasoning in Dycus which interprets Caudle v. Betts to restrict the use of the "substantially certain" test.