HIGGINBOTHAM, J.
|4Pefendants appeal a judgment rendered in favor of the plaintiffs after an eight-day jury trial in which the jury found a general contractor liable to its statutory employee for an “intentional act.” The jury also found the engineering companies responsible for guy wiring and bridge design liable under a negligence theory. For the reasons assigned, we reverse the jury“verdict in part, amend in part, affirm in part as amended, and render judgment.
FACTS AND PROCEDURAL HISTORY
This is a wrongful death case arising out of the collapse of a steel reinforcing bar (rebar) cage built during a 2009 bridge-widening project on the Huey P. Long Bridge near the Westbank of the Mississippi River in Bridge City, Louisiana. Two men who were working on the rebar cage, Ulvaldo Soto Martinez and Martin Reyes, died as a result of the collapse.[1] The decedents were employees of J.L. Steel Reinforcing, LLC (J.L. Steel), which was the subcontractor responsible for constructing the rebar cage and securing it in place on top of a 60-foot-high footing that had been built to support one of the bridge columns. The rebar cage was actually designed and built to become the interior reinforcement for the vertical concrete column known as W-2, which would ultimately support part of the newly widened roadbed for the bridge. The rebar cage was raised by a crane and placed on top of the column footing that had been erected days prior to the collapse of the cage.
The Louisiana Department of Transportation and Development (DOTD) contracted with the design engineering firm of Modjeski & Masters, Inc. (M & M) to design the bridge-widening project. DOTD contracted with a joint venture of Kiewit Louisiana Co., Massman Construction Co., and Traylor Bros., Inc., (KMTC-JV), a new company that was jointly formed for purposes of the project, |Bto serve as the general contractor on the project. Kiewit Engineering Co. (KECO) was hired by KMTC-JV to design guy-wiring plans to be used by KMTC-JV in connection with the placement of the steel rebar cages. The purpose of the guy wiring plan was to protect the rebar cage *917 from possible collapse due to wind forces. KMTC-JV subcontracted with the decedents’ employer, J.L. Steel, to pre-assem-ble and install steel rebar cages for the project. CMC Rebar manufactured the steel rebars that were used on the project and also created the placement plan drawing for the W-2 column.
On June 12, 2009, KMTC-JV employees used two cranes to raise the pre-construct-ed 62,888-pound rebar cage that had been built by J.L. Steel employees in a horizontal position on the ground. One crane lifted the top portion of the 55 to 60-foot tall cage while the other was used, temporarily, to hold the bottom of the cage steady. KMTC-JV’s crane operator, Jeff Mayon, operated the lift and placed the rebar cage on top of the column footing. J.L. Steel’s workers, Martinez and Reyes, then tied the rebar extending from the column footing on which they were standing to the rebar cage that had just been set in place. KMTC-JV employees tied guy wires from various levels of the rebar cage to 9,600-pound concrete deadman blocks on the ground. After the tie-in was complete, Martinez and Reyes were instructed to unhook the crane from the top of the rebar cage, Within thirty minutes of the removal of the crane, the rebar cage collapsed and the two workers fell approximately 60 feet to their deaths.
On September 2, 2009, suit was filed by Martinez’s wife, Maria Cruz Maldonado, individually, as representative of the decedent’s estate, and on behalf of their two minor children, Justin and Usvaldo Maldonado, and by the decedent’s brother, Gilberto Soto Martinez (hereafter referred to as plaintiffs). Made defendants were KMTC-JV, KECO, their insurer Zurich American [ insurance Company (Zurich), M & M and others.[2] Maldonado asserted a survival claim on behalf of Martinez’ estate and wrongful death claims on behalf of herself and her two children. Gilberto Martinez asserted a claim for bystander damages pursuant to La. Civ.Code art, 2315.6 Plaintiffs asserted claims against KMTC-JV for negligence and “intentional acts.” Plaintiffs’ claims against KECO and M & M were based in negligence. On the first day of trial, the trial court granted KMTC-JV’s motion for summary judgment, finding that Martinez was the statutory employee of KMTC-JV, thereby limiting the plaintiffs’ recovery from KMTC-JV to workers’ compensation unless plaintiffs could prove that KMTC-JV acted intentionally in causing Martinez’s death.
After trial, the jury rendered a verdict against KMTC-JV for intentional acts. It also concluded that KECO and M & M were negligent in causing the accident. The jury allocated fault as follows: 80% to KMTC-JV, 10% to KECO, and 10% to M & M. The jury awarded a total of $13 million .to plaintiffs. The trial court entered a judgment in accordance with the jury verdict on June 1, 2012. KMTC-JV, KECO, Zurich[3] and M & M all suspen-sively appealed the judgment.
ASSIGNMENTS OF ERROR
Defendants KMTC-JV and KECO aver that the trial court legally erred in admit *918 ting evidence of subsequent remedial measures, prior dissimilar accidents not involving KMTC-JV or KECO, privileged attorney-client communications, and prejudicial photographs. They also contend that the trial court gave erroneous instructions and an erroneous verdict form to the jury. These defendants maintain that all of the legal errors tainted the jury’s verdict, thereby | ^requiring de novo review by this court. These defendants further argue that, even if the trial court did not commit legal error, the jury committed manifest error in concluding that KMTC-JV acted intentionally in causing the death of Martinez; assigning 10% fault to KECO; and alternatively, awarding excessive damages.
Defendant M & M avers that the trial court committed legal error in allowing plaintiffs’ expert to give opinion testimony on the interpretation of M & M’s contract with DOTD; prohibiting M & M from meaningful cross-examination of plaintiffs’ expert on voir dire regarding the local standard of care applicable to M & M’s performance; and refusing to allow M & M’s expert to testify as a professional engineer because, in retired status, he did not maintain his license. M & M further avers that the jury erred in finding M & M at fault and in awarding Martinez’s brother mental anguish damages without evidence to support the claim and in awarding him excessive damages. M & M also contends that the jury erred in awarding excessive damages to Martinez’s surviving wife and two minor sons and in awarding excessive general damages for suffering by Martinez before his death.
STANDARD OF REVIEW
The resolution of legal issues may involve questions of fact and questions of law. Wingfield v. State, ex rel. Dept. of Transp. and Development, 2001-2668, 2001-2669 (La.App. 1st Cir.11/8/02), 835 So.2d 785, 799, writs denied, 2003-0313, 2003-0339, 2003-0349 (La.5/30/03), 845 So.2d 1059-1060, cert. denied, 540 U.S. 950, 124 S.Ct. 419, 157 L.Ed.2d 282 (2003). Factual determinations are the sole province of the trier of fact, whether judge or jury. Id. To preserve the right to a fair trial, the function of the entity that views the witnesses and hears testimony firsthand must be safeguarded. Id. When the process of credibility determinations and fact-finding operates correctly, the factual findings are reviewed by this court using the manifest error or clearly [¿wrong standard Id; Stobart v. State, Department of Transportation and Development, 617 So.2d 880, 882-83 (La.1993).
 When the jury makes a factual finding based on admissible evidence, even though a different finding would have been reached by this court, that finding will not be reversed unless it is clearly wrong. Wingfield 835 So.2d at 799. Where there are two permissible views of the evidence, the factfinder’s choice between them cannot be manifestly erroneous. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). However, if a trial judge commits consequential error by denying the jury relevant, admissible evidence, or by admitting evidence that should have been excluded, the fact finding process is interdicted; thus, the verdict is tainted. See McLean v. Hunter, 495 So.2d 1298, 1304 (La.1986).
A legal error occurs when a trial court applies incorrect principles of law and such errors are prejudicial. Evans v. Lungrin, 97-0541, 97-0577 (La.2/6/98), 708 So.2d 731, 735. If the admission or exclusion of evidence tainted a jury verdict, this court steps into the shoes of the factfinder and conducts a de novo review of all of the admissible evidence. See Wingfield, 835 So.2d at 799. De novo review should be limited to consequential errors, that is, *919 errors which prejudiced or tainted the verdict rendered. Id. Absent a tainted verdict, review is limited to determining whether the jury committed manifest error. Id. We further note that allocation of fault is a factual finding within the discretion of the trier of fact. It also is reviewed under the manifest error standard. Id. at 804.
LAW AND ANALYSIS
One of the central questions presented in this case is whether the conduct of the general contractor/statutory employer, KMTC-JV, rises to the level of an intentional act, thus providing an exception to the rule that the Louisiana Workers’ Compensation Act (Act) is the employee’s exclusive remedy for a [ flwork-related injury or death caused by his employer or a coworker. Louisiana Revised Statute 23:1032(B) provides for the intentional act exception, as follows;
Nothing in this Chapter shall affect the liability of the employer ..., civil or criminal, resulting from an intentional act.
Our courts frequently cite the legislative history of this Act, amended in 1976, to illuminate the fact that the legislature intended to keep the exception narrow. As stated by various commentators, “[t]he only reasonable conclusion to be drawn from the legislative process is that both houses of the legislature rejected attempts to make the exception any broader than ‘intentional’ acts of the employer, thereby giving the exception a narrow scope, limited to conduct which is truly intentional.” Malone & Johnson, Louisiana Civil Law Treatise, Volume H, Workers’ Compensation Law & Practice, § 365, p. 206 (3rd edition 1994). Another commentator notes that where the conduct goes beyond aggravated negligence and includes an employer who knowingly permits a hazardous work condition to exist or knowingly orders a claimant to perform an extremely dangerous job or willfully fails to furnish a safe place to work, this still falls short of the kind of intention to injure that rises to the level of intentional act. Larson, 2A Workmens’ Compensation Law, § 68.13 (1989). See Reeves v. Structural Preservation Systems, 98-1795 (La.3/12/99), 731 So.2d 208, 210.
In Bazley v. Tortorich, 397 So.2d 475, 480 (La.1981), the Louisiana Supreme Court concluded that the words “intentional act” mean the same as “intentional tort” in reference to civil liability. “Intent” is found when the person who acts either (1) consciously desires the physical result of his act, whatever the likelihood of that result happening from his conduct;. or (2) knows that the result is substantially certain to follow from his conduct, whatever his desire may be as to that result. Id. at 481.
ImSince the intentional act exception to the Act was passed in 1976, many cases, have interpreted the language. The jurisprudence reveals a solid respect for the legislature’s policy decision and has narrowly interpreted the exception. Williams v. Gervais F. Favrot Co., Inc., 573 So.2d 533, 540 (La.App. 4th Cir.), writ denied, 576 So.2d 49 (La.1991). In Williams, two workers were killed when a rebar cage fell from the twenty-second floor of a building under construction. One worker was inside the cage as it was lifted. The other worker stood on the form to guide the cage in. Part of the crane contacted the form and the worker on the form tried to push it off. The concrete form had not been braced and the form with the cage fell off of the building, killing both workers. Testimony of the foreman showed that he had intended to brace the form, but that had not been done. OSHA standards were violated by having a worker in the cage during the lift. Nevertheless, the Fourth Circuit held that the employer did *920 not know, to a substantial certainty, that an injury would occur. The court found that the trial judge may have been generous in concluding that the method chosen was “dangerous” and “stupid.” Nevertheless, it concluded that the testimony could not be interpreted to mean that the supervisory personnel adopted a procedure that would intentionally cause personal injury. The supervisors did not intend that the form would fall ánd the decedents would be killed nor did they desire that result. The court of appeal concluded that the supervisory personnel did not believe those consequences were substantially certain to follow. Id.
In Reeves, 731 So.2d at 208-209, the supreme court again addressed the question of whether the substantial certainty requirement of the intentional act exception to the exclusivity provision of the Act was met. There, the employer directed an employee to manually move a sandblasting pot.[4] Although the procedure was prohibited by OSHA and 'the supervisor feared it would eventually |ncause injury, the supreme court held that these facts did not meet the strict requirement of the exception. In discussing “substantially certain,” the court noted the following:
In human experience, we know that specific consequences are substantially certain to follow some acts. If the actor throws a bomb into an office occupied by two persons, but swears that he only “intended” to hurt one of them, we must conclude that he is nonetheless guilty of an intentional tort as to the other, since he knows to a virtual certainty that harmful consequences will follow his conduct, regardless of his subjective desire.
Reeves, 731 So.2d at 212-213.
The Reeves court further noted that other workers had manually moved the pot on several occasions, and no one had been injured before. Id. at 213. The supervisor testified that he believed that the employee could move the pot without incident. Id. The court determined that the jury’s conclusion that the employer’s conduct constituted an intentional act was nor reasonable in light of the record reviewed in its entirety. Id.
The Reeves decision noted that substantially certain to follow requires more than a reasonable probability that an injury will occur and certain is defined as inevitable or incapable of failing. Id. See also Danos v. Boh Bros. Const. Co., LLC, 2013-2605 (La.2/7/14), 132 So.3d 958, 959-60. The supreme court cited numerous cases in Reeves in which the employer’s conduct was held insufficient to meet-the substantial certainty test, to wit: (1) an employer’s knowledge that a machine is dangerous and that its use creates a high probability that someone will eventually be injured from such use is not sufficient to meet the requirement, Holliday v. B.E. & K. Const. Co., 563 So.2d 1333, 1334 (La.App. 3d Cir. 1990); (2) knowledge and appreciation of risk does not constitute intent; reckless or wanton conduct by an employer does not constitute intentional wrongdoing, Jasmin v. HNV Cent. Riverfront Corp., 642 So.2d 311 (La.App. 4th Cir.1994); (3) gross negligence is not an adequate basis to find that the employer knew, to a substantial certainty, that its conduct would cause injury or death, Gallant v. Transcontinental Drilling Co., 471 So.2d 858, 861 (La.App. 2d Cir.1985); (4) failing to provide adequate safety equipment is not an adequate basis for finding that the | ^employer knew, to a substantial certainty, that its conduct would cause injury or death, Jacobsen v. Southeast Distributors, Inc., 413 So.2d *921 995, 996-997 (La.App. 4th Cir.) writ denied., 415 So.2d 953 (La.1982); and (5) violation of OSHA standards is not an adequate basis for finding that the employer knew, to a substantial, certainty, that its conduct would cause injury or death, Williams, 578 So.2d at 541.
In Reeves, 731 So.2d at 212, the supreme court further noted a few cases where an intentional tort was found: (1) an employer’s conduct was held to rise to the level of intentional act when the employer repeatedly exposed the employee to a chemical where the employee had become ill on two prior occasions after exposure to it, Trahan v. Trans-Louisiana Gas Co., Inc., 618 So.2d 30, 31-32 (La.App. 3d Cir.1993); and (2) when an employer ordered an employee to work in a ditch that had caved in the previous day and the ditch had not been reinforced and looked like it would cave in again, the employer was held to have intended the harm when the employee was injured, Wainwright v. Moreno’s, Inc., 602 So.2d 734, 739 (La.App. 3d Cir.1992).
KMTC-JV’S LIABILITY
Before we analyze the statutory employer’s conduct in this case, we must first examine some evidentiary rulings of the trial court and the pertinent law.
A.) Subsequent Remedial Measures—
Louisiana Code of Evidence article 407 provides:
In a civil case, when, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event. This | ^Article does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, authority, knowledge, control, or feasibility of precautionary measures, or for attacking credibility.
In Givens v. De Soto Bldg. Co., 156 La. 377, 380, 100 So. 534, 535 (1924), the Louisiana Supreme Court enunciated the policy of excluding evidence of subsequent remedial measures. The court noted that:
[T]he great weight of authority is that evidence of changes or repairs made subsequent to the injury, or as to precautions taken subsequently to prevent recurrence of injury, is not admissible as showing negligence or as. amounting to an admission of negligence. The reason for the rule is that the effect of declaring such evidence competent would be to inform a defendant that, if he makes changes or repairs, he does it under a penalty; for, if the evidence is competent, it operates as a confession that he was guilty of prior wrong. True policy and sound reason require that men should be encouraged to improve, or repair, and not be deterred from it by the fear that if they do so their acts will be construed into an admission that they had been wrongdoers. A rule, which so operates as to deter men from profiting by experience and availing themselves of new information, has nothing to commend it, for it is neither expedient nor just.
In Toups v. Sears, Roebuck and Co., Inc., 507 So.2d 809, 816 (La.1987), the Louisiana Supreme Court stated:
In general, remedial measures taken after an incident of negligent conduct are not admissible in evidence because such evidence would discourage people from taking steps to prevent future harm.
In Northern Assur. Co. v. Louisiana Power & Light Co., 580 So.2d 351, 357 *922 (La.1991), the Louisiana Supreme Court noted that the prohibition against evidence of subsequent remedial measures is designed to bring within the scope of the rule any change, repair or precaution subsequent to an accident. The prohibition covers measures taken after an event, such as post-accident repairs, installation of safety devices, changes in design, the removal of dangerous conditions, changes in procedure, the dismissal of an employee charged with causing an accident, changes in regulations, and changes in labels or instructions. | uId. It is with these principles in mind that we review the trial court’s evi-dentiary rulings as to subsequent remedial measures in the instant case.
Initially, plaintiffs aver that KMTC-JV and KECO waived their right to appeal prejudicial legal error by failing to object at trial when the evidence was offered. Defendants KMTC-JV and KECO filed motions in limine on several evidentiary issues prior to trial. Thus, we must address whether filing motions in limine in this case preserved these defendants’ claims of error for appeal.
(1) Objections and Motions in Limine—
The trial court has great discretion in its consideration of evidentiary matters such as motions in limine. Heller v. Nobel Ins., Group, 2000-0261 (La.2/2/00), 753 So.2d 841, 841. Louisiana Code of Civil Procedure article 1635 provides:
Formal exceptions to rulings or orders of the court are unnecessary. For all purposes it is sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which he desires the court to take or his objection to the action of the court and his grounds therefor; and, if a party has no opportunity to object to a ruling or order at the time it is made, the absence of an objection does not thereafter prejudice him.
Louisiana Code of Evidence article 103 provides, in pertinent part:
A. Effect of erroneous ruling. Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and
(1) Ruling admitting evidence. When the ruling is one admitting evidence, a timely objection or motion to admonish the jury to limit or disregard appears of record, stating the specific ground of objection[.]
In Whitehead v. Kansas City Southern Ry. Co., 99-896 (La.App. 3d Cir.12/22/99), 758 So.2d 211, 218, writ denied, 2000-0209 (La.4/7/00), 759 So.2d 767, the court stated:
Opposing counsel may object to the introduction of evidence prior to trial by filing a motion in limine. A party need not make a formal objection at the time a trial court rules on the admissibility of the evidence, but need only make known the action he desires of the court and his grounds therefor. La.Code Civ. P. art. 1635. After ruling evidence inadmissible, the trial court shall permit the party seeking its introduction to proffer the evidence or make a statement as |1Bto the nature of the evidence. La Code Civ, P. art. 1636. The trial court’s rulings on the admissibility of evidence are reviewable on appeal without the necessity of further formality.
In Joseph v. Williams, 2012-0675 (La.App. 4th Cir 11/14/12), 105 So.3d 207, 216, plaintiff filed a motion in limine regarding the admission of evidence, which was denied. Plaintiff took writs to the Fourth Circuit and to the Louisiana Supreme Court. Both writ applications were denied. On appeal plaintiff re-urged that the trial court’s interlocutory ruling denying her motion in limine was erroneous. De *923 fendant argued that the objection was waived because there was no contemporaneous objection to the introduction of the evidence at trial. The court of appeal pretermitted the issue, but stated in a footnote:
Insofar as the lack of a contemporaneous objection, the Louisiana Code of Evidence (La.C.E. art. 103), unlike the Federal Rules of Evidence, is silent on whether a party is required to renew an evidentiary objection on which a definite ruling is obtained pre-trial by motion in limine in order to preserve that claim for. appeal The federal rules of evidence expressly provide that “[o]nce the court rules definitively on the record — either before or at trial — a party need not renew an objection or offer of proof to preserve a claim of error for appeal.” Federal Rules of Evidence Rule 103(b), ... [T]his provision, which was added to the federal rule in 2000, eliminates the procedural trap asserted here because it “apparently eliminates the need for a party to make continuous objections, or to make an objection ‘general’ to a line of questioning. Frank L. Maraist, 19 Louisiana Civil Law Treatise, Evidence and Proof § 2.7 (2012 ed.).... [Bjefore the 2000 amendment federal courts adhered to the rule that a motion in limine is insufficient to preserve error in the admission of evidence where the contemporaneous objection requirement of Rule 103 is not met.
Id. at 216 n. 10.
In Lafleur v. John Deere Co., 491 So.2d 624, 632 (La.1986), the Louisiana Supreme Court noted that the court of appeal erred when it declined to review the issue of whether evidence should have been excluded on the grounds that defendants failed to object timely to presenting the evidence at trial. The supreme court stated:
The court of appeal was of the opinion that the defendants’ failure to object constituted a waiver of the right to object and that they could l1finot urge the objection on appeal. Richard v. Southwest Louisiana Hospital Association, 383 So.2d 83 (La.App. 3d Cir.1980), writ denied, 385 So.2d 274 (La.1980). A review of the record indicates that the defendants did not fail to object to the introduction of the videotape. The court of appeal was mistaken in its contrary conclusion. In fact[,] defendants filed a Motion in Limine objecting to the introduction of the videotape, inter alia, and that motion was overruled by the trial judge.
Id. at 632.
In the instant case, defendants KMTC-JV and KECO filed motions in limine in which they objected to and fully briefed the issues of the admissibility of subsequent remedial measures, prior accidents, and evidence protected by the attorney-client and work product privileges.[5] Defense counsel reminded the trial court of pending motions in limine and specifically sought a ruling excluding subsequent remedial measures prior to trial. With respect to the motion in limine to exclude prior accidents, the court stated that that issue would be decided later. The trial court stated that it would rule on subsequent remedial measures later, after voir dire, and advised counsel not to mention them in opening statements. At lunch hour after voir dire had been completed, the court stated, “we have about five minutes” to finish the motions.
*924 Under the circumstances in this case, we find that defendants KMTC-JV and KECO preserved the right to appeal these evidentiary rulings. They filed motions, fully briefed the issues and thereby made known to the court the action they desired the court to take and. the grounds for then-objections. La.Code Civ. P. art. 1635. Further, defendants repeatedly sought a ruling from the court as to these motions in limine.
(2) Review of the Trial Court’s Eviden-tiary Rulings—
During trial, the court declined to rule on the motion in limine on subsequent remedial measures. Instead, the court allowed the jury to determine whether an Inaction was a subsequent remedial measured.[6] The court denied the motion in limine on prior accidents. In addition, although it granted the motion in limine as to attorney-client privilege, KMTC-JV and KECO claim that the court admitted evidence protected by that privilege, contrary to the trial court’s earlier ruling. Those defendants also claim that the trial court permitted at least six witnesses to testify about changes made by KMTC-JV after the accident and allowed introduction of twenty-one exhibits pertaining to post-accident changes in the work.[7]
In Reichert v. State, Dept. of Transp. and Development, 96-1419, 96-1460 (La.5/20/97), 694 So.2d 193, 200, the Louisiana Supreme Court found that the court of appeal properly held that four particular exhibits were improperly admitted into evidence. Thus, the appellate court was required to conduct a de novo review of the record, giving no weight to the verdict and deciding the case by a preponderance of the evidence. The court found that one particular exhibit was prepared after the accident had occurred. Thus, the DOTD’s recommendation for a flashing beacon had the potential to prejudice the decision of the factfinders by “raising an unwarranted [inference] that the state was negligent at the time of the offense.” Id.
While it is true that a trial court has broad discretion on evidentiary rulings, it is likewise true that where the trial court abuses its discretion, its decision should not be allowed to stand. In McLean v. Hunter, 495 So.2d 1298, 1304 (La.1986), the supreme court noted: “When a jury is given incorrect instructions in the law, or when a trial court makes a consequential error in the exclusion of evidence, no 1 ^weight should be accorded the judgment of the trial court which implements the jury verdict.” (Citing Thomas v. Missouri Pacific R. Co., 466 So.2d 1280 (La.1985); Otto v. State Farm Mut. Auto. Ins. Co., 455 So.2d 1175 (La.1984); Ragas v. Argonaut Southwest Ins. Co., 388 So.2d 707 (La.1980); Gonzales v. Xerox Corp., 254 La. 182, 320 So.2d 163 (1975)). The court held that the jury verdict was tainted by the trial court’s consequential error in excluding testimony of a doctor, and further held, in such situations, the jury verdict is simply not entitled to a presumption of regularity. McLean, 495 So.2d at 1304.
In the instant case, we find legal error in the admission of evidence of subsequent *925 remedial measures.[8]
B.) Other Accidents—
During questioning of Mike Sul-ser, a civil engineer employed by Traylor Brothers, Inc., one of the joint venture partners in KMTC-JV, plaintiffs’ counsel asked: “this deal about cages collapsing is nothing new to Kiewit, is it?” Sulser replied that he did not know about Kiewit’s previous experience. KMTC-JV’s counsel objected on the grounds that the witness was not a Kiewit employee. Plaintiffs’ counsel showed plaintiffs’ exhibit 130 to Sulser as he read it to the jury. Plaintiffs’ exhibit 130 is a report prepared by KECO in connection with an industry-wide study on rebar cage installation, which it conducted after the instant accident. It contained information about three accidents that had occurred more than ten years before the instant accident. Prior to Sul-ser’s testimony, defendants strongly objected to evidence of other unrelated accidents and reminded the trial court that the motion in limine had been filed. In response, the trial court entertained argument on the motion. Plaintiffs’ counsel argued that the evidence was admissible to impeach the witness regarding testimony that KMTC-JV was a |19safe company.[9] The trial court overruled defendants’ objection on other grounds and admitted the testimony and exhibits.
Louisiana Code of Evidence articles 402 and 403 require that the evidence sought to be introduced be relevant, but relevant evidence may be excluded if its probative value is . substantially outweighed by the danger of unfair prejudice. In Lee v. K-Mart Corp., 483 So.2d 609, 613 (La.App. 1st Cir.1985), writ denied, 484 So.2d 661 (La.1986), this court held that evidence of other accidents is only relevant where such accidents are closely related in circumstances to the accident, injury or hazard at issue in the instant case. To be relevant, the other accident should occur at substantially the same place and under substantially the same conditions and must be caused by the same or a similar defect, danger, act or omission. Evidence of other accidents occurring at substantially different places or under different circumstances or conditions is irrelevant and inadmissible. Id. In Lee, a witness was allowed to testify to other accidents that she could not establish the cause of and that she had not witnessed. This court concluded that the failure to establish the predicate that the cause of the other accidents was the same or similar to the accident at issue rendered the evidence inadmissible. Plaintiff contended the evidence was admissible to impeach the testimony. This court stated: “It is well settled that witnesses cannot be impeached on collateral and irrelevant matters.”[10] Id.
In the instant case, after the court allowed introduction of plaintiffs’ exhibit 130, defendants’ witness, John Proskovec, testified to the lack of similarity between the other accidents and the instant acci *926 dent. Plaintiffs did not establish Uphow the accidents occurred, where the accidents occurred, or the names of the parties involved in those accidents. Failure to establish the proper predicate renders the evidence inadmissible, and thus, admission of the other accidents was legal error.
C.) Attorney-Client/Work-Product Privilege—
Louisiana Code of Civil Procedure article 1424 is entitled “Scope of discovery; trial preparation; materials.” Article 1424(A) provides that the trial court shall not order the production or inspection of any writing obtained or prepared by the adverse party, his attorney, surety, indem-nitor, or agent in anticipation of litigation or in preparation for trial unless satisfied that denial of production or inspection will unfairly prejudice the party seeking the production or inspection in preparing his claim or defense or will cause him undue hardship or injustice. Article 1424(A) further provides that the court shall not order the production or inspection of any part of the writing that reflects the mental impressions, conclusions, opinions, or theories of an attorney. Thus, the “attorney work-product rule” generally prohibits the release of information prepared in anticipation of litigation unless prejudice or hardship is shown to occur if access to the privileged information is denied. See Cooper v. Public Belt R.R., 2002-2051 (La.App. 4th Cir.1/22/03), 839 So.2d 181, 184.
The purposes of the work-product rule are to provide an attorney a “zone of privacy” within which he is free to evaluate and prepare his case without scrutiny by his adversary and to assist clients in obtaining complete legal advice. Id.; Hodges v. Southern Farm Bureau Cas. Ins. Co., 433 So.2d 125, 131-132 (La.1983).. Louisiana jurisprudence has consistently recognized that the privilege created by the work-product doctrine is qualified, not absolute. See e.g. Landis v. Moreau, 2000-1157 (La.2/21/01), 779 So.2d 691, 697.
|⅞1⅛ Cacamo v. Liberty Mut Fire Ins. Co., 99-1421 (La.App. 4th Cir.10/10/01), 798 So.2d 1210, 1214, writ not considered, 2001-3087 (La.1/25/02), 806 So.2d 665, unit denied, 2001-2985 (La.1/25/02), 807 So.2d 844, the court noted:
Louisiana’s work[-]product rule states that a court shall not order the production of a document prepared by an adverse party in anticipation of litigation or trial unless the denial of production will unfairly prejudice the party seeking production. [La.Code Civ. P.] art. 1424. Under no circumstances should a court order the production of documents reflecting the “mental impressions, conclusions, opinions, or theories of an attorney or an expert.” Id. Only documents and evidence obtained in anticipation of litigation or trial are covered by the work-product doctrine. See Board of Com’rs of New Orleans Exhibition Hall Authority v. Missouri Pacific R. Co., 613 So.2d 174 (La.App. 4[th] Cir.1992).
Article 1424 requires a two-fold inquiry for determining if documents are protected by the privilege: (1) Were the articles obtained or prepared in anticipation of litigation or trial? and (2) Will the party seeking production be unfairly prejudiced, subject to undue hardship, or subject to injustice by denial of the discovery? See Smith v. Travelers Ins. Co., 418 So.2d 689 (La.App. 4[th] Cir.1982), rev’d on other grounds, 430 So.2d 55 (La.1983). To determine if the work-product privilege applies, a court should consider the content, nature, and purpose of a document, not the date or time that the document was prepared. See Federal Deposit Ins. Corp. v. Butler, 488 So.2d 741, 743 (La.App. 4[th] Cir.1986).
*927 The attorney-client privilege is found in Article 506 of the Louisiana Code of Evidence. The general rule is that a client has a privilege to refuse to disclose, and to prevent another person from disclosing, a confidential communication between certain categories of individuals, whether oral, written or otherwise, made for the purpose of facilitating the rendition of professional legal services to the client, as well as the perceptions, observations, and the like, of the mental, emotional or physical condition of the client in connection with such a communication. La.Code Evid. art. 506(B). To establish the attorney-client privilege, several elements must be proven by the party asserting the privilege: 1) the holder of the privilege is or sought to become a client; 2) the communication was made to an attorney or his subordinate in a professional | ^capacity; 3) the communication was made outside the presence of strangers; 4) the communication was made for the purpose of obtaining a legal opinion or services; and 5) the privilege has not been waived. In re Shell Oil Refinery, 812 F.Supp. 658, 661 (E.D.La.1993); Cacamo, 798 So.2d at 1216. Under Louisiana law, the party asserting the privilege has the burden of proving that the privilege applies. Cacamo, 798 So.2d at 1216. Further, the party asserting the privilege must adequately substantiate the claim and cannot rely on a blanket assertion of privilege. Id.
In the instant case, defendants claim that the trial court initially ruled correctly that material generated by a Kiewit corporate attorney was privileged, but then later erred in admitting the attorney’s information through the video deposition of Jeffrey Travis, KMTC-JV’s non-testifying expert. Travis was hired on behalf of KMTC-JV and worked with attorney Glen Summers. He investigated the accident and preserved some artifacts and evidence.[11]
Prior to trial, KMTC-JV filed a motion in limine as to the privileged information. KMTC-JV sought to exclude all references to privileged communications and to documents identified in its privilege logs. The information was submitted to the trial court for an in camera inspection. On the first day of trial, the trial court ruled on KMTC-JV’s motion in limine and held that attorney Summers’ notes were privileged.[12] During trial, plaintiffs played portions of Travis’s video deposition testimony, who read from notes that he repeatedly testified were made pursuant to information given to him by attorney Summers. The trial court allowed the testimony over KMTC-JV’s objection and instructed the jury on privilege.
|2SA review of the record leaves no doubt that much of Travis’ testimony was based on information provided to him by corporate attorney Summers. The information was gathered by Summers in anticipation of litigation and in preparation for trial. It was provided to Travis, who assisted Summers and was a non-testifying expert. Louisiana Code of Civil Procedure article 1425(D)(2) restricts discovery of facts known to, and opinions held by, experts employed in anticipation of litigation and preparation for trial who are not expected to be called as witnesses at trial. Under Louisiana Code of Evidence article 506(B)(2), communications from Summers to Travis were communications between a lawyer and a representative of the lawyer *928 (defined in La.Code Evid. art. 506(A)(4) as a person engaged by the lawyer to assist the lawyer in his rendition of legal services), that were made in furtherance of providing professional legal services. Accordingly, this court finds legal error in the admission of the Travis testimony.
We must now determine whether the aforementioned legal errors tainted the jury’s verdict as to KMTC-JV. As stated above, proof that KMTC-JV knew that its conduct would cause harm is the key to proving KMTC-JVs liability. Travis’ testimony forms the basis of plaintiffs’ claims that KMTC-JV experienced problems at W-3 and W-4, the two columns that were built before the accident occurred at W-2. Specifically, plaintiffs established, through Travis’ testimony, that the rebar cages at those two prior columns leaned. Consequently, plaintiffs repeatedly argued that KMTC-JV knew that its method was substantially certain to cause harm. The jury also heard evidence of other accidents related to rebar cages, suggesting knowledge of KMTC-JV. despite proof that KMTC-JV did not actually exist when the prior accidents occurred, The jury also heard many witnesses testify to procedural changes made after the accident, such as cutting the rebar cages in half and keeping the crane attached | ^longer. We find that the trial court’s cumulative legal errors in admitting the inadmissible evidence was of such a serious prejudicial nature that it justifies this court giving little or no weight to the jury’s verdict. See Gonzales, 320 So.2d at 165. Thus, our finding of prejudicial legal error requires us to conduct a de novo review of the entire record as to KMTC-JVs liability.
A review of the admissible evidence in the record shows that no other witness besides Travis testified about leaning re-bar cages constructed at any of the other columns for the project. KMTC-JV crane operator, Mayon, specifically testified that he was the crane operator on the W-3 and W-4 columns on the Huey P. Long Bridge project, and he saw no leaning of any rebar cages. Angel Corona, J.L. Steel’s foreman on the job, testified that he had not noticed any significant bending or buckling of a rebar cage prior to this accident.
Michael Phelps, Kiewit field engineer, testified that he was near the crane on the date of accident. He testified that he did not see the rebar cage at column W-2 lean before the crane was unhooked, and he never heard anyone say that they saw the cage leaning before the crane was unhooked. He testified that similar rebar cages stood overnight with no crane attached, only guy wires. Phelps also testified that he did not think the W-2 rebar cage was too large before the lift was made and that it was only two-to-three-feet taller than those used on earlier lifts. He testified that the W-2 rebar cage was spot checked before the lift, and no problems were identified. Phelps further testified that the DOTD contract administrator, Louisiana Timed Managers, a Joint Venture Partnership (LTM), did not create any non-conformance reports on any of the rebar cages for the project.
John Proskovec, vice president of Kiewit Louisiana and manager of the Louisiana area for the company, testified that KMTC-JV made a mistake in the field when attaching guy wires. He testified that Ceasar Velador pulled a tape to 12Smeasure the location for the blocks and thought he was putting them in the right places, but after the accident, they saw that KMTC-JV had not followed the guy wiring plan, which was prepared by KECO. Proskovec testified that, if the guy wiring plan had been followed, the accident would not have happened. He further testified that if this cage was doomed to fail, *929 KMTC-JV did not know that, “[tjhere’s no way I could have know [sic] that, no way Dan [Michalowski, KMTC-JV supervisor] could have known that, no way anybody on site could have known ... that it was going to fail internally.” Proskovec also testified that KMTC-JV had never been involved before or since this accident in an accident involving a rebar cage collapse. He testified that he did not obtain knowledge that KMTC-JV or Michalowski knowingly deviated from the plan. He further stated that OSHA did not find that KMTC-JV intended this or knew that it was substantially certain to follow. Pros-kovec testified that mistakes were made and it was a horrible thing, but no one intended the accident. In summary, Pros-kovec’s testimony established that no one at KMTC-JV knew that installing the W-2 rebar cage in this fashion would cause anyone to be harmed.
Mike Sulser, a Traylor Brothers engineer, testified that he is a licensed Louisiana engineer and worked as the rebar and concrete coordinator on the project. He testified that he worked with J.L. Steel on this project every day since the work began in 2008. He also worked closely with CMC Rebar. Sulser testified at length regarding the safety measures and procedures followed at the job site, including a hazard analysis, a work plan quality analysis, and several layers of regular safety meetings with all parties involved.
Bruce Peterson, M & M project manager, testified that no one at M & M believed that KMTC-JV intentionally caused the accident nor has M & M ever believed that KMTC-JV knew or was substantially certain that the accident was going to occur, but then did the operation anyway. Frank Denton, M & M’s Inexpert, also concluded that KMTC-JV did not know in advance that this accident was substantially certain to happen and then proceeded with the project anyway. Plaintiffs expert, Dr. James Harold Deatherage, testified that he reviewed 30,-000 documents, as well as testimony, and did not find any evidence that anyone from KMTC-JV intended to harm anyone. We understand how the jury could have concluded that KMTC-JV was at fault. Then-conduct was certainly negligent and perhaps even grossly negligent, but our thorough review of the admissible evidence in the record convinces us that KMTC-JVs conduct does not rise to the level of an intentional act. Even if we considered the admission of testimony about prior leaning of rebar cages as harmless error that testimony does not suffice to prove that KMTC-JV knew that the accident was substantially certain to follow. As in Reeves, 731 So.2d at 212-213, there had been no prior accident. Also similar to Reeves, the fact that the employer knew that the work was dangerous is not sufficient to support a finding that the employer intended the harm to occur. Likewise in this case, we conclude that the test for finding an intentional act is not met under these facts, and thus, the judgment rendered in accord with the jury verdict casting KMTC-JV 80% at fault is reversed. Plaintiffs’ exclusive remedy against this statutory employer is pursuant to the Louisiana Workers’ Compensation Act.
Having concluded that KMTC-JVs conduct did not constitute an intentional act, we pretermit a full discussion and legal analysis of KMTC-JV’s assignments of error regarding incomplete and confusing jury instructions on intentional acts and prejudicial photographs.
KECO’S LIABILITY
KMTC-JV and KECO contend that the jury manifestly erred in concluding that KECO was 10% at fault and that KECO’s fault contributed to the death of *930 Martínez. The basis of this argument is that KECO provided a very |27limited scope of work on the project, providing only a guy wiring plan, which was not followed. It is well settled that a court of appeal may not set aside a trial court’s or a jury’s finding of fact in the absence of “manifest error” or unless it is “clearly wrong.” Rosell, 549 So.2d at 844, The two-part test to determine whether to reverse a factfinder’s determinations is: 1) the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and 2) the appellate court must further determine that the record establishes that the finding is clearly wrong. Mart v. Hill, 505 So.2d 1120, 1127 (La.1987). The issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder’s conclusion was a reasonable one. Sistler v. Liberty Mut. Ins. Co., 558 So.2d 1106, 1112 (La.1990). Even though an appellate court may feel its own evaluations and inferences are more reasonable than the fact-finder’s, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. See Rosell, 549 So.2d at 844-45; Arceneaux v. Domingue, 365 So.2d 1330, 1333 (La.1978).
Applying the standard of review set out above, we cannot say that the jury’s finding of fault on the part of KECO was manifestly erroneous, Dr. Deatherage testified that the KECO guy wiring plan failed to give tension directives for the wires. He testified that KECO was in the best position to raise the question of the rebar cage stability and that KECO should have performed a stability analysis. The testimony of Dr. Deatherage that KECO should have mandated specific tension on the wires and should have performed a cage stability analysis is a reasonable basis on which the jury could have concluded that KECO was negligent and that KECO’s fault contributed to the collapse of the rebar cage. This is true despite the fact that KECO’s plan was not followed. Even if legal error in connection with evi-dentiary rulings interdicted the factíjfind-ing2S process as to KECO, and even after we exclude the erroneously admitted evidence, we conclude, based on our de novo review of the evidence in the record, there is still adequate evidence to support the jury’s conclusion that KECO was at fault and that its fault caused or contributed to Martinez’s death. Accordingly, this assignment of error has no merit.
M & M’S LIABILITY
M & M argues that the trial court committed reversible error when it allowed plaintiffs’ expert to give opinion testimony interpreting the contract between M & M and DOTD. M & M also contends that Louisiana law requires that plaintiffs claiming professional negligence must establish that the professional failed to perform his services in accordance with the skill normally exercised by others in his profession in the same locality and plaintiffs in this case failed to establish what that standard was. M & M further argues that the trial court erred in prohibiting M & M from conducting a meaningful cross-examination of plaintiffs’ expert on voir dire as to the locality standard of care, and additionally, the trial court erred in refusing to allow M & M’s engineering expert to testify regarding the locality standard of care because his license expired after he retired from practice. M & M avers that these legal errors resulted in the jury erroneously finding that M & M caused or contributed to Martinez’s death.
Under Louisiana law, where the words of a contract are clear and unambiguous, interpretation of the con *931 tract is a question of law and subject to de novo review. See Guest House of Slidell v. Hills, 2010-1949 (La.App. 1st Cir.8/17/11), 76 So.3d 497, 499. If a contract is ambiguous, courts are to seek the meaning based on the intent of the parties to the contract. Id. Louisiana Civil Code article 2045 provides that “[interpretation of a contract is the determination of the common intent of the parties.” We are obligated to give legal effect to contracts according to the true intent of the parties. La. Civ.Code art. 2045; Guest House of Slidell, 76 So.3d at 499. The true intent of the parties to a contract is to be determined by the words of the contract when they are clear, explicit and lead to no absurd consequences. La, Civ.Code art. 2046; Guest House of Slidell, 76 So.3d at 499. In such cases, the meaning and intent of the parties to the written contract must be sought within the four corners of the instrument and cannot be explained or contradicted by parol evidence. La. Civ. Code art. 1848; Guest House of Slidell, 76 So.3d at 499. Such contracts are to be interpreted as a matter of law, and the use of extrinsic evidence is proper only where a contract is ambiguous after an examination of the four corners of the agreement. Guest House of Slidell, 76 So.3d at 499. In cases in which the contract is ambiguous, the agreement shall be construed according to. the intent of the parties. Id. Intent is an issue of fact, which is to be inferred from all of the surrounding circumstances. Id. A doubtful provision must be determined in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract and other contracts of a like nature between the same parties. La. Civ.Code art. 2053; Guest House of Slidell, 76 So.3d at 499.
M & M filed two motions in limine seeking to prohibit plaintiffs’ expert, Dr. Deatherage, from testifying as to the meaning of the contract, between M & M and DOTD, and the scope of M & M’s duty thereunder. M & M sought a ruling from the trial court prior to plaintiffs’ expert being offered to testify.[13] The trial court allowed Dr. Deatherage to give opinion testimony as to M & M’s duty under the contract. M & M argues that allowing Dr. Deatherage to give his opinion of the meaning of the contract was prejudicial legal error. We agree.
IsnAdmissibility of expert testimony in Louisiana is governed by Louisiana Code of Evidence article 702, which provides: “If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.” A trial court is accorded broad discretion in determining whether expert testimony is admissible and who should or should not be permitted to testify as an expert. Merlin v. Fuselier Const. Inc., 2000-1862 (La.App. 5th Cir.5/30/01), 789 So.2d 710, 718.
However, Dr. Deatherage’s opinion was not relevant to assist the jury on a technical issue or in determining the contracting parties’ intent. Admission of the testimony on this point was prejudicial legal error. The jury could have easily concluded that M & M had a duty to involve itself in the contractor’s decisions on how to build the columns for the bridge. In addition, the expert’s testimony in this regard does not meet the standards of technical or special knowledge. See Cheairs v. State ex rel. *932 Department of Trans. and Development, 2003-0680 (La.12/3/03), 861 So.2d 536, 540-541. It is merely conclusory. Accordingly, we find that the jury verdict is entitled to no weight on this issue, and we must conduct a de novo review of the record as to M & M’s liability.
To determine the scope of the duty owed by M & M, this court must consider the express provisions of the contract between the parties. See Day v. National U.S. Radiator Corp., 241 La. 288, 128 So.2d 660, 666 (1961). The contract between DOTD and M & M is for design services. Supplement 28 to the contract addresses M & M’s duty to provide design services during construction. It reads, in pertinent part:
J^SCOPE OF SERVICES
The services to be performed by the Consultant as set forth in the original Contract, Supplemental Agreements No. 1 through 27 and Extra Work Letters No. 1 through 5 are hereby augmented to perform design services during construction for the Main Bridge/Westbank and Eastbank Approaches Contract, more specifically described as follows:
November 1, 2008 through the duration of the construction period.
• Meetings and Coordination-Attend partnering meetings, LTM meetings, and other meetings as required.
• Shop Drawing Checking and Construction Procedure Reviews-Review and check contractor prepared shop drawings and review contractor’s construction procedures.
• Design RFI’s-Review contractor requests for information and requested changes in design details to accommodate contractor’s particular plant (sic) and methods.
• Construction RFI’s-Review contractor request for information and requested changes in details to deal with unforeseen circumstances and events.
• Plan Changes-Execute and process plan changes when needed.
Review of the specifications for the bridge project contained in Section 806.03 of the Red Book (the standard specifications required by the State of Louisiana for roads and bridges) shows that M & M is required to review the reinforcing steel list the contractor intends to use on the job and the placement drawings for that steel. However, M & M argues that the contract does not require M & M to review erection procedures. Since we find that the words of the contract are ambiguous in that they are subject to different interpretations, we must review the testimony of the parties to determine their intent. Record testimony of the relevant parties is as follows.
Steven Spohrer, LTM deputy director of construction, testified that the Red Book did not require M & M to review erection drawings for any column used on this project. M & M was required to review shop drawings in order to determine that what the contractor planned to build was in conformity with M & M’s design. 132However, Spohrer testified that no rebar cage erection drawings were submitted by LTM (the State’s contract administrator for DOTD) to M & M for review.
Tom Thorn, KMTC-JV project manager, testified that he had overall responsibility for the project. He testified that it was KMTC-JVs duty to place the guy wires and to decide how to lift the rebar cage and that M & M had no duty to observe work at the site. Thorn testified that the placement drawings for the W-2 column did not address how the column would be built. He further testified that M & M had no involvement with design of the *933 rebar cage, building the cage or hooking it to or unhooking it from the crane, M & M had no duty relative to these “temporary structures.” M & M designed the work, but it was not responsible for the methods used to build it.
Bruce Peterson, senior associate project manager for M & M, testified that M & M had no duty to go to the site unless called on to do so and that M & M was not called to go to the site in connection with any column work. He also testified that M & M was not asked to review any construction procedures for steel reinforced columns. Peterson stated that the Red Book spells out which shop drawings are required to be submitted to M & M by the general contractor. According to Peterson, there is no requirement that M & M review the general contractor’s construction procedures for reinforced steel concrete columns. M & M reviewed placement drawings to ensure that the bridge was being built in accordance with the plans and specifications. Peterson testified that M & M does not review shop drawings for erection procedures, and the specific methods for building the bridge are chosen exclusively by the general contractor. He further testified that M & M never received a guy wiring plan for any rebar cage. Additionally, Peterson stated that LTM did not ask M & M to review the May 2009 guy wiring plan for the W-2 column. Peterson testified that only two items were sent to M & M to review under Supplement 28 of the contract with DOTD Issthat pertained to EBBW-2: 1) shop drawings for steel, and 2) the September 2008 guy wiring plan for concrete* forms.
Our review of the record convinces us that, under its contract with DOTD, M & M did not have a duty to review erection procedures in connection with the construction of the W-2 column. As the design engineer, M & M reviewed only the items it was specifically asked to. review and that were sent to it by LTM. LTM was under contract with DOTD to provide construction management, and it had on-site presence throughout the project. When M & M reviewed CMC Rebar’s placement plans for the reinforcing steel required to be included inside of the W-2 column, M & M fulfilled its contractual obligation to DOTD by verifying that KMTC-JV intended to build the column as designed.
Based on the admissible evidence and the applicable law, we conclude that M & M had no duty to review the contractor’s means and methods for erection of the rebar cages and did not review the erection plan for the rebar cage involved in the accident or for any other cage.
The trial court also committed legal error in denying M & M’s counsel the right to fully cross-examine plaintiffs’ expert regarding the standard of care applicable to M & M’s conduct, Also fatal to plaintiffs’ claim against M & M was their failure to introduce evidence of the standard of care in the locality. Dr. Deatherage testified that the standard of care is what a reasonably prudent contractor or engineer would do under similar circumstances, regardless of where he is. He testified that he never practiced engineering in Louisiana. He also admitted that he made no investigation regarding the standard of care applicable to Louisiana engineers or to the location of the project.
In Carter v. Deitz, 556 So.2d 842, 843 (La.App. 4th Cir.), writs denied, 566 So.2d 960, 992 and 998 (La.1990), M & M, a professional engineering firm, conducted bridge safety studies on the Greater New Orleans Bridge and ^recommended that a bridge safety barrier not be installed. After an automobile accident occurred, M & M was sued for professional negligence for failing to recommend installation of the *934 barrier. The jury cast M & M and others in liability for plaintiffs’ injuries. On appeal, the judgment against M & M was reversed. The court noted that review of the record revealed that plaintiffs’ expert failed to establish the professional standards by which the finder of fact was to judge defendant M & M’s safety studies and recommendations. Id. at 869. The court found that this was an essential element of plaintiffs’ burden of proving that M & M committed professional negligence. Id. at 867. The court concluded that, notwithstanding that fatal omission, no competent evidence adduced at trial suggested that M & M’s recommendation deviated from the requisite professional standards. Id. at 869. The court noted that the expert testimony of another civil engineer, familiar with the practice of civil engineering in Louisiana, was needed to establish the requisite standard of care and skill against which M & M’s safety studies and recommendations were to be judged. Id. ('citing Sams v. Kendall Const. Co., 499 So.2d 370, 374 (La.App. 4th Cir.1986)).
In the instant case, Dr. Deatherage did not give testimony establishing the standard of care by which M & M’s conduct was to be judged. Instead, he testified to his personal opinion based on his own inclination or belief that the design engineer on this bridge project should have sought out the general contractor’s means and methods of building what M & M designed.
Our review of the record reveals that plaintiffs failed to establish the standard of care by which M & M’s conduct was to be judged. Further, there is no evidence that suggests M & M’s design of the bridge expansion was faulty. | ^Accordingly, the judgment finding M & M at fault in causing or contributing to Martinez’s death is reversed.[14]
DAMAGES
All defendants challenge the total jury award of $13 million to the plaintiffs. The jury awarded damages as follows;
Survival—
Award for Ulvaldo Soto Martinez’s suffering prior to his death:
$250,000 Terror during the fall
$250,000 Bodily pain and suffering before death
$500,000 Emotional and mental anguish after the fall, prior to death
$1,000,000 TOTAL
Wrongful Death—
Maria Cruz Maldonado’s award for the wrongful death of her husband:
$500,000 Past emotional pain and suffering
$1,500,000 Future emotional pain and suffering
$100,000 Past lost economic benefits.
$1,400,000 Future lost economic benefits
$1,500,000 Loss of love, affection and society
TOTAL $5,000,000
*935 Wrongful Death—
Justin Maldonado’s award for the wrongful death of his father:
$700,000 Past emotional pain and suffering
$750,000 Future emotional pain and suffering
$1,500,000 Loss of love, affection and society
$50,000 Future lost economic benefits
TOTAL $3,000,000
Wrongful Death—
Usvaldo Maldonado’s award for the wrongful death of his father:
$700,000 Past emotional pain and suffering
$750,000 Future emotional pain and suffering
$1,500,000 Loss of love, affection and society
$50,000 Future lost economic benefits
TOTAL $3,000,000
| ?ñBgstunder—
Gilberto Soto Martinez’s award for witnessing the death of his brother:
$500,000 Past emotional pain and suffering
$250,000 Future emotional pain and suffering
$250,000 Loss of love, affection and society
$1,000,000 TOTAL
The factfinder is given much discretion in the assessment of damages. La. Civ.Code art. 2324.1. The vast discretion vested in the factfinder should rarely be disturbed on appeal. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). Damage awards on appellate review will be disturbed only when there has been a clear abuse of that discretion. Theriot v. Allstate Ins. Co., 625 So.2d 1337, 1340 (La.1993). The initial inquiry must always be directed at whether the trial court’s award for the particular injuries and their effects upon this particular injured person is a clear abuse of the factfinder’s much discretion. Emery v. Owens-Corporation, 2000-2144 (La.App. 1st Cir.11/9/01), 813 So.2d 441, 457, writ denied, 2002-0635 (La.5/10/02), 815 So.2d 842; Reck v. Stevens, 373 So.2d 498, 501 (La.1979). Only after such a determination of an abuse of discretion is a resort to comparative analysis of prior awards appropriate, and then for the purpose of determining the highest or lowest point which is reasonably within that discretion. Youn, 623 So.2d at 1260 (citing Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976)).
A plaintiff is entitled to recover for all damages necessary to compensate for the physical injuries suffered. Hymel v. HMO of Louisiana, Inc., 2006-0042 (La.App. 1st Cir.11/15/06), 951 So.2d *936 187, 204, writ denied, 2006-2938 (La.2/16/07), 949 So.2d 425. General damages are those that may not be fixed with any degree of pecuniary exactitude but which, instead, Involve mental or physical pain or suffering, inconvenience, the loss of gratification or intellectual |a7or physical enjoyment, or other losses of life or of lifestyle, which cannot really be measured definitively in terms of money. Id. at 204-205. In reviewing a general damage award, a court does not review a particular item in isolation; rather, the entire damage award is reviewed for an abuse of discretion. Graham v. Offshore Specialty Fabricators, Inc., 2009-0117 (La.App. 1st Cir.1/8/10), 37 So.3d 1002, 1018. With these principles in mind, we review the damages awarded by the jury in this case.
A.) Survival Damages—
The jury awarded a total of $1 million for pain and suffering and mental anguish suffered by Martinez, before his death. Survival damages may be awarded for the pre-death mental and physical pain and suffering of the deceased. Leary v. State Farm Mut. Auto. Ins. Co., 2007-1184 (La.App. 3d Cir.3/5/08), 978 So.2d 1094, 1098, writ denied, 2008-0727 (La.5/30/08), 983 So.2d 900. See also Temple v. Liberty Mut. Ins. Co., 330 So.2d 891, 893-894 (La.1976). In determining survival damages, the factfinder should consider the severity and duration of any pain and suffering or any pre-impact fear experienced by the deceased up to the moment of death. Leary, 978 So.2d at 1098. “Survival damages are properly awarded if there is even a scintilla of evidence of pain or suffering on the part of the decedent, and fright, fear, or mental anguish during an ordeal leading to the death is compensable.” Leary, 978 So.2d at 1098 (quoting Patrick v. Employers Mut. Cas. Co., 99-94 (La.App. 3d Cir.8/11/99), 745 So.2d 641, 652, writ denied, 99-2661 (La.11/24/99), 750 So.2d 987).
A survival action permits recovery only for damages actually suffered by the deceased from the time of injury to the moment of death. Etcher v. Neumann, 2000-2282 (La.App. 1st Cir.12/28/01), 806 So.2d 826, 840, writ denied, 2002-0905 (La.5/31/02), 817 So.2d 105; Samuel v. Baton Rouge Gen. Med. Center, 99-1148 (La.App. 1st Cir.10/2/00), 798 So.2d 126, 129. Where there is no | .^indication that a decedent consciously suffered, an award for pre-death physical pain and suffering should be denied. Samuel, 798 at 129; Pierre v. Lallie Kemp Chanty Hosp., 515 So.2d 614, 619 (La.App. 1st Cir.), writ denied, 515 So.2d 1111 (La. 1987). The question of whether the decedent actually consciously suffered is a factual issue, governed by the manifest error-clearly wrong standard. See Cavalier v. State of La. through DOTD, 2008-0561 (La.App. 1st Cir.9/12/08), 994 So.2d 635, 645; Etcher, 806 So.2d at 840.
The testimony revealed that Martinez fell from a height of over 60 feet when the rebar cage collapsed. He was found lying face down and was breathing when the first person arrived to assist him. He died at the scene shortly thereafter. There is no evidence in the record that Martinez was conscious at the scene. Therefore, we find that the jury award of $250,000 for Martinez’s physical pain and suffering before his death is abusively high.
The evidence supports a finding that Martinez would have been frightfully aware that he was likely to die or suffer serious injury when the rebar cage started its descent. While pre-impact fear is com-pensable, we deem the jury’s award of $250,000 for terror during the fail and $500,000 for mental anguish after the fall, but prior to his death, to be so excessive as *937 to constitute an abuse of the jury’s discretion.
In Raymond v. Government Employees Ins. Co., 2009-1327 (La.App. 3d Cir.6/2/10), 40 So.3d 1179, 1192, writ denied, 2010-1569 (La.10/8/10), 46 So.3d 1268, an award of $50,000 for survival damages was affirmed where the decedent died due to a ear, crash. The court noted that the decedent was aware that the collision was about to occur and he obviously feared the collision. At the scene, the decedent grunted and raised his head two or three times, and his eyes were halfway open. He was transported to the hospital and was observed to have | .^suffered severe chest and abdomen trauma, multiple left rib fractures and pulmonary contusions.
In Long v. State, Through the Dept. of Trans. and Dev., 37,442 (La.App. 2d Cir.11/24/03), 862 So.2d 149, reversed on other grounds, 2004-0485 (La.6/29/05), 916 So.2d 87, the driver of a vehicle that collided with a train was killed. A witness testified that he heard the collision and, on arrival at the scene, observed the decedent lying on the ground. He testified that he knelt beside the decedent, saw that she was alive and tried to give her comfort. The witness stated that when he called the decedent’s name, she tried to respond by making gurgling sounds. He further testified that in response to his questions, the decedent’s body tensed and she appeared to try to speak, but she could not form words. The witness also testified that the decedent experienced difficulty breathing and that her body was “mangled” with apparent severe fractures of her arms and legs. He estimated that the decedent lived for approximately twenty to thirty minutes after impact. Id. at 156-57. The court concluded that, based on the testimony and the photographs depicting the extensive damage caused to the decedent’s vehicle, there was evidence from which the jury could have found that the decedent was conscious for a period of time following the collision and that she experienced pain and suffered prior to losing consciousness, Id. at 157, The court affirmed an award of $250,000 in survival damages. Id.
Based on our review of jurisprudence and considering the facts of the instant case, we find that the highest amount to be reasonably within the jury’s discretion for survival damages in this case is $300,000.[15] *938 Thus, we will decrease the award for survival damages from $1 million to $300,000.
|,inB.) Wrongful Death Damages—
Wrongful death claims do not arise until the victim dies, and they are meant to compensate the designated survivors for their loss of the decedent. See La. Civ.Code art. 2315.2. The elements of the award for wrongful death include loss of love, affection, companionship, support, and funeral expenses. Wingfield, 835 So.2d at 808.
The jury awarded Maldonado the sum of $5 million in wrongful death damages. Of that sum, $1.5 million is for loss of love, affection, and society, and $2 million is for past and future emotional pain and suffering. The remaining $1.5 million awarded to Maldonado is for economic loss, which we will address separately. The jury also awarded $3 million in wrongful death damages to each of decedent’s minor sons, which included $50,000 each for lost economic benefits. All defendants argue these awards are abusively high.
Maldonado testified that she and Martinez met when she was fourteen years old. They dated for seven years and married in 2000, when she was twenty-three years old. It is clear from the testimony that they had a loving relationship and that Maldonado misses her husband very much. They had two sons, Usvaldo Jr., born on December 25, 2001, and Justin, born on August 22, 2005. Martinez was proud of their two sons, and he supported the family doing |41 construction work. On the date of his death, Martinez was thirty-three years old and his sons were seven and three,
We find that the jury abused its discretion in awarding $3.5 million for pain and suffering and loss of love, affection and society to Maldonado. In Roberts v. Owens-Corning Fiberglas Corp., 2003-0248 (La.App. 1st Cir.4/2/04), 878 So.2d 631, 644, writ denied, 2004-1834 (La.12/17/04), 888 So.2d 863, this court affirmed a $1 million wrongful death award to a surviving spouse of a 45-year marriage whose husband experienced an excruciatingly painful death from mesothelioma. The wife in that case quit her job to care for her dying husband and left her family home in order to move her husband into an apartment in closer proximity to his doctors. She took care of her husband for months and held his hand when he died. This court reduced a surviving spouse’s $1 million wrongful death award to $500,000 in Wingfield, 835 So.2d at 807-808. Mr. Wingfield was 60 years old at the time of death, and he spent a lot of time on the road as a truck driver, but the couple had been married for 27 years and had a close and loving relationship. In O’Connor v. Litchfield, 2003-0397 (La.App. 1st Cir.12/31/03), 864 So.2d 234, 245-247, writ not considered, 2004-0655 (La.5/7/04), 872 So.2d 1069, this court affirmed a wrongful death award of $300,000 to the surviving spouse and $200,000 to the adult son. Mr. O’Connor injured his ankle and back in a fall and, during treatment, was discovered to have a fatal disease, which was exacerbated by his injuries. He was under hospice care for the last six months of his life. This period was noted to be especially difficult for his wife and son. Nevertheless, the appellate court affirmed the aforementioned award.
We find that the highest amount the jury could have reasonably awarded for wrongful death damages to the surviving spouse of this nine-year marriage |42under these facts Is $750,000.[16] Therefore, we *939 reduce the jury award to Maldonado for wrongful death damages from $3.5 million to $750,000.
The children were seven and three on the date of their father’s death. They face a future without their father’s affection, care, assistance and advice. Nevertheless, we find that the jury abused its discretion in awarding each child $3 million for wrongful death damages. A jury award of $125,000 in damages to each of the decedent’s two minor children and $100,000 to each of three adult children was upheld by this court in Ratliff v. State ex rel. Dept. of Transp. and Development, 2002-0733 (La.App. 1st Cir.3/28/03), 844 So.2d 926, 939, writ denied, 2003-1739 (La.10/10/03), 855 So.2d 350. In Scott v. Pyles, 99-1775 (La.App. 1st Cir.10/25/00), 770 So.2d 492, 495, writ denied, 2000-3222 (La.1/26/01), 782 So.2d 633, this court found that the highest that could be awarded to 13-year-old and 10-year-old daughters for the loss of their father was $500,000 and $400,000, respectively. In light of the evidence in the record, we find that an award of $450,000 is the highest amount the jury could have reasonably awarded to each minor child in the instant case. Therefore, we reduce the wrongful death damage award from $3 million to $450,000 for each minor child.
|4SC.) Bystander Damages—
Louisiana Civil Code article 2315.6 allows recovery for mental anguish or emotional distress sustained by a claimant. The damages must result from witnessing an event that caused physical injury to another. The brother of the decedent is among the individuals who have a cause of action. See La. Civ.Code art. 2315.6(A)(3). In order to recover, a claimant must prove that the extent of harm sustained by the tort victim was so severe that it could reasonably be expected that the claimant would experience severe and debilitating emotional distress. La. Civ.Code art. 2315.6(B).
All defendants claim that the jury abused its discretion in awarding $1 million to decedent’s brother, Gilberto Martinez. Defendants KMTC-JV and KECO also claim that the jury committed manifest error in awarding damages in two categories: (1) future emotional pain and *940 suffering, $250,000; and (2) loss of love, affection and society, $250,000.
We agree that the damage award is excessive. A review of the testimony shows that Gilberto Martinez was working on the project on the accident date and saw the rebar cage collapse. When he ran to help, he saw his brother on the ground with the others present. Gilberto Martinez testified that his brother did not speak, his eyes were closed, and he was bleeding from the mouth. Gilberto Martinez was there when his brother took his last breath. He estimated that his brother lived for about twenty to twenty five minutes after the ambulance arrived. Gilberto Martinez testified that he has not consulted with a doctor, nor has he seen a counselor or a priest as a result of witnessing his brother’s death. There was no testimony indicating that he missed any work subsequent to the accident. He testified that he has had nightmares about his brother since the accident.
Under the circumstances of this case, we find that the jury committed manifest error in awarding $500,000 to Gilberto Martinez for past emotional pain |44and suffering combined with $250,000 for future emotional pain and suffering resulting from witnessing the accident. Further, the $250,000 award for loss of love, affection and society is not a recoverable element of damages for a bystander. See La. Civ.Code art, 2315.6(A).
In Craighead v. Preferred Risk Mut. Ins. Co., 33,731 (La.App. 2d Cir.8/25/00), 769 So.2d 112, 123, writ denied, 2000-2946 (La.12/15/00), 777 So.2d 1230, an award of $50,000 was affirmed for a brother who witnessed his younger sister being hit by a car and being thrown 63 feet, resulting in her death. His mother testified that he handled the situation well in counseling. His father testified that he showed his grief physically through crying and getting sick. In the two years since the accident, the only change was the length of time between episodes. Pursuant to our review of the record, the highest reasonable amount for bystander damages under the facts in this case is $100,000.[17] Thus, we reduce the total bystander damages awarded to Gilberto Martinez from $1 million to $100,000.
D.) Economic Loss—
Awards for loss of support include loss of support from the date of death to the date of trial and loss of future support from the date of trial through the length of the decedent’s work-life expectancy. Brossett v. Howard, 2008-535 (La.App. 3d Cir.12/10/08), 998 So.2d 916, 932, writ denied, 2009-0077 (La.3/6/09), 3 So.3d 492. Factors to be considered in determining a proper award for 14Slost future income are the decedent’s physical condition before his death, the decedent’s past work history and consistency thereof, the amount the decedent probably would have earned ab *941 sent the death, and the probability that the decedent would have continued to earn wages over the remainder of his working life. Id. (quoting Magee v. Pittman, 98-1164 (La.App. 1st Cir.5/12/00), 761 So.2d 731, 749, writ denied, 2000-1694 (La.9/22/00), 768 So.2d 31). We note that, when opinions of experts differ, it is for the factfinder to determine the most credible evidence, and these determinations will not be overturned unless it is proven that the expert’s stated reasons are patently unsound. Brown v. City of Madisonville, 2007-2104 (La.App. 1st Cir.11/24/08), 5 So.3d 874, 881, writ denied, 2008-2987 (La.2/20/09), 1 So.3d 498.
Defendants initially argue that no lost wages can be awarded in this case because Martinez was an undocumented alien, and the federal Immigration Reform and Control Act (“IRCA”), 8 U.S.C. § 1324, prohibits the employment of undocumented aliens.[18] Defendants rely on Hoffman Plastic Compounds, Inc. v. N.L.R.B., 535 U.S. 137, 122 S.Ct. 1275, 152 L.Ed.2d 271 (2002). However, Hoffman is inapposite to the issue of whether an undocumented alien worker is entitled to recover an award for lost wages. We find that nothing in IRCA requires that tortfeasors should not be held liable for their negligence when the person whom they harm is working in the country illegally or has violated IRCA. See Madeira v. Affordable Housing Foundation, Inc., 469 F.3d 219, 243-249 (2d Cir.2006).
Lost earnings awards in wrongful death and survival actions are state tort remedies and are equivalent to those authorized under the Longshore and Harbor | ^Workers’ Compensation Act (LHWCA)[19] and state workers’ compensation statutes. Their purpose is to make the decedent, and those who relied on him for support, whole, by paying them for the amount the decedent would have earned if not for defendant’s negligence. We see no valid reason to deny recovery of an element of damages available in tort cases, ie. lost wages from a third-party tortfeasor, simply because the damages are sustained by an illegal, undocumented worker. However, though the legal status of an employee is not relevant to the issue of liability and will not automatically preclude recovery of lost wages, we find that the legal status of an employee is highly relevant in determining what amount to award for loss of support.
In the instant case, since Martinez was not legally authorized to be in this country, he was subject to deportation at any time. Based on these facts, we conclude that defendants were entitled to establish that use of past wages to calculate future damages was improper, and they were entitled to show what a proper measure of damages should be. It was error for the trial court to exclude that evidence. Since the record contains all necessary evidence on which to base a determination of an award, including the proffer of economic testimony, we will conduct a de novo review on the issue of economic loss.
Plaintiffs’ economic expert, Dr. Gerald Cassanave, calculated Martinez’s loss of earnings based on a five-year history of earnings using the years 2003, 2004, 2005, 2008 and 2009. He calculated an average *942 annual income of $35,130. He testified that Martinez had a work-life expectancy of twenty-four years. He added 9.9% for fringe benefits and calculated that loss to be $928,484. In addition, Dr. Cassanave testified that the value of household services that would |47be lost due to Martinez’s death was $445,018.20.[20] Dr. Cas-sanave calculated a total economic loss of $1,373,502.
Defendants’ expert economist, Dr. Kenneth Boudreaux, calculated Martinez’s earnings based on a five-year history using his five consecutive years of earnings prior to the accident. This period gave an annual average wage of $20,550. He testified that the documents normally relied on to calculate economic loss, such as tax returns and social security earnings records were not available for review. Dr. Bou-dreaux criticized Dr. Cassanave for skipping the years 2006 and 2007, claiming they were recession years in the construction industry, since those were boom years in construction in south Louisiana, Dr. Boudreaux reduced the total amount of projected future earnings by 26%, which represents the projected personal consumption by Martinez. Dr. Boudreaux calculated a total economic loss of $330,000. He did not add any amount for fringe benefits and was critical of Dr. Cas-sanave for doing so since there was no evidence that Martinez ever received fringe benefits on any job. He also criticized Dr. Cassanave’s analysis for including loss of household services since there was no evidence that costs for such services were incurred after Martinez’s death. Review of the proffered testimony of Dr. Boudreaux shows that in his home country, Martinez would have earned approximately $3,699.05 annually. He testified that; using Mexican wage rates, the total loss of earnings for a twenty-four-and-one-third-year work-life expectancy is $66,505.88.
After a thorough review of the record, we conclude that the jury’s award of $1.6 million for loss of economic benefits is manifestly erroneous. We therefore reduce the award for economic loss to $330,000 based on U.S. wages as testified to by Dr. Boudreaux using five consecutive years of earnings before Martinez’s death.
| ^CONCLUSION
This tragic accident was caused by the negligence of KMTC-JV in selection of the means and methods for erection of column W-2 on the Huey P. Long Bridge. Our exhaustive review of the record convinces us that KMTC-JV neither intended to harm anyone on this job she nor did it have knowledge that harm was substantially certain to result from the means and methods it selected to build this column. Plaintiffs’ recovery against KMTC-JV is limited to workers’ compensation. Thus, we reverse the jury verdict in part as to the fault of KMTC-JV.
Although the evidence shows that the KECO guy wiring plan was not followed, there is testimony in the record that KECO should have tested the rebar cage stability and should have supervised the implementation of its guy wiring plan. Therefore, we cannot say that the jury’s finding that KECO was at fault is manifestly erroneous. Accordingly, we affirm the jury verdict in part, to the extent it cast KECO 10% at fault.
We also hold that M & M, as design engineer, had no duty to inspect the methods employed by the general contractor who was responsible for building the bridge expansion. Accordingly, we re *943 verse the jury’s finding that M & M was at fault.
As for the damages awarded by the jury, we hereby amend the damage awards as follows: survival damages, $800,000; wrongful death damages to spouse, $750,000; wrongful death damages to each child, $450,000; loss of support, $830,000; and bystander damages to brother, $100,000; for a total damage award of $2,380,000, which is subject to the 10% allocation of fault as to KECO.
For all the reasons assigned, we hereby reverse the judgment rendered in accordance with the jury verdict in part, amend in part, affirm in part as amended, |49and render judgment in favor of plaintiffs. All costs of this appeal are assessed to KECO.
REVERSED IN PART; AMENDED IN PART; AFFIRMED IN PART AS AMENDED; AND RENDERED.
McDonald, J., agrees in part and dissents in part and assigns reasons.
GUIDRY, J., concurs in part, dissents in part, and assigns reasons.

. The Reyes family filed a separate wrongful death action in Texas. Vargas v. Kiewit La Co., (S.D. Tex. 6/17/09)(unpublished).

. DOTD and Arch Insurance Company settled with plaintiffs and were dismissed with prejudice. J.L. Steel was also dismissed with prejudice. The ease proceeded to trial against the remaining defendants, KMTC-JV, KECO, Zurich, and M & M, Twin City Fire Insurance Co., J.L. Steel’s insurer, filed suit for declaratory judgment regarding insurance coverage and that suit was consolidated with the Maldonado case for trial.

. As the insurer for KMTC-JV and KECO, Zurich's arguments on appeal are the same as its insureds; therefore, in the interest of economy, we will refer only to its insureds.

. The pot weighed 350-400 pounds empty and could hold up to 1,000 pounds of sand.

. The trial court granted the motion in limine as to attorney-client privilege on the first day of trial.

. The trial court stated: "Wherever it says, subsequent remedial measures, take it out (of what is read to the jury). If it doesn’t say subsequent remedial measures, then the jury is going to decide if it is a subsequent remedial measure.” The court gave the jury an instruction on subsequent remedial measures.

. Defendants list the challenged witnesses and exhibits as follows: Cesar Rodriguez, Angel Rodriguez, Dr. James Harold Deatherage, John Proskovec, Michael Phelps and Mike Sulser; plaintiffs’ exhibits: 20, 24, 36, 39, 44, 51, 92, 95, 109, 130-132, 134-135, 137, 143, 160, 162, 183-484.

. We acknowledge plaintiffs’ assertion that the subsequent remedial measures showed knowledge, control and feasibility and further were not voluntary. We find the assertion to be without merit.

. Plaintiffs did not establish that KMTC-JV was involved in the other incidents; thus, this evidence could not be used as impeachment of KMTC-JVs safety record. In fact, the evidence shows that KMTC-JV did not exist when the other incidents occurred. The "study” merely states that a Kiewit entity or a subcontractor was involved in three accidents in 1994 or 1995 and provides scant detail.

.In the instant case, plaintiffs' counsel ar'gued that the evidence was admissible for impeachment purposes. That' argument fails for the same reason noted in Lee, supra.

. KMTC-JV provided Travis for a deposition because he went to the scene of the accident and preserved evidence.

. The trial court stated that an attorney enjoys a privilege with his client and unless he opens the door, "then that ruling is going to stand.”

. For the same reason previously discussed, we find that the motions in limine, as well as the parties seeking a ruling on the motions just prior to this witness being presented to testify, preserved the issue for appeal.

. Because of our holding reversing liability as to M & M, we pretermit M & M’s specification error on whether the trial court erred in refusing to allow its retired expert, Frank Denton, to testify.

. See Hutto v. McNeil-PPC, Inc., 2011-609 (La.App. 3d Cir.12/7/11), 79 So.3d 1199, 1217-1219, writ denied, 2012-0402 (La.4/27/12), 86 So.3d 628, cert. denied, - U.S. -, 133 S.Ct. 428, 184 L.Ed.2d 289 (2012) ($1 million award for survival damages affirmed where child suffered acetaminophen poisoning and suffered horrible pain in the hospital for four days before her death, was cognizant of parents’ presence, but neither could touch daughter to comfort her due to the severity of the poisoning); Wingfield, 835 So.2d at 809-810 (survival damage award of $800,000 was affirmed to wife whose husband was killed in tractor/trailer accident was affirmed — one complete amputation, one crushed leg with partial amputation, severe chest injury, fractured ribs, massive bleeding and passenger was conscious at the scene and survived three hours after being transported to the hospital); Cavalier, 994 So.2d at 645-646 (the decedent hydroplaned, collided with another car and died almost immediately. The trial court reduced the jury’s $200,000 award to $50,000 on JNOV, and this court held no abuse of discretion, because there was no evidence as to conscious suffering whatsoever, and "[wjhile an award for pre-impact fear is compensable, the evidence was speculative regarding the extent to which Alfred actually realized he was about to die or suffer serious bodily injury,” and he probably gasped three or four times after the "original big pain”); Leary, 978 So.2d at 1098-1099 (court affirmed award of $650,000 in survival damages where the decedent sustained multiple severe injuries in a head-on collision, was conscious and in terrible pain, was trapped in the car for an hour, and continually asked her parents to turn her while in the hospital. She died twenty-eight hours later. She endured pre-impact fear, pain, and suffering). •

. See Rick v. State, Dept. of Transp. & Development, 93-1776, 93-1784 (La.1/14/94), 630 So.2d 1271, 1277, reversed on other grounds, Long v. State ex rel. Dept, of Transp. and *939 Development, 916 So.2d 87 (La.6/29/05) (supreme court considered the fact that a couple worked together every day in the family business as grounds for reinstating the trier of fact’s award of $400,000 to decedent’s husband.); Moss v. State, 2007-1686 (La.App. 1st Cir.8/8/08), 993 So.2d 687, 705-706, writ denied, 2008-2166 (La.11/14/08), 996 So.2d 1092, (the decedent died instantly in car accident due to unreasonable road conditions, separate $20,000 awards for two children aged 18 and 20 and widow was abuse of discretion, awards raised to lowest reasonable amount of $100,000 and $300,000 respectively); Shilling ex rel. Shilling v. State ex rel. Dept. of Transp. & Development, 2005-0172 (La.App. 1st Cir.12/22/05), 928 So.2d 95, 102-103, writ denied, 2006-0151 (La.4/24/06), 926 So.2d 541, (affirmed $70,000 award to four-year-old whose father was killed where witness testimony, indicated that the child remembered little about his father); Gibson v. State, through Dept of Transp. and Development., 95-1418, 95-1419 (La.App. 1st Cir.4/4/96), 674 So.2d 996, 1006, writs denied, 96-1862, 96-1895, and 96-1902 (La. 10/25/96), 681 So.2d 373 and 374, (close relationship and difficulty of wife in recovering from the death of her spouse was considered in award of $350,000, which was affirmed on appeal); Faucheaux v. Terrebonne Parish Consol. Government, 625 So.2d 683, 685 (La.App. 1st Cir. 1993), (loving relationship and twenty-seven-year marriage were factors considered in the affirmation of a general damage wrongful death award of $300,000 to surviving spouse), Raymond, 40 So.3d at 1191-1192, (awards of $1,500,000 to the surviving spouse of an accident victim and $750,000 to each of his four children affirmed on appeal).

. Monk v. State, ex rel. DOTD, 2005-97 (La.App. 3d Cir.6/29/05), 908 So.2d 688, 697, writ denied, 2005-2337 (La.10/17/06), 940 So.2d 642, (award of $75,000 to mother of adult daughter who was killed near mother’s home after visiting there with her three children affirmed on appeal); Cox v. Moore, 2001-878 (La.App.3d Cir, 12/12/01), 805 So.2d 277, 288-289, writ denied, 2002-0724 (La.5/31/02), 817 So.2d 94, (award of $150,000 to mother for pain and anguish in witnessing daughter’s death in auto accident where one of her last memories would be seeing her daughter’s head half-missing and daughter making a gurgling sound and mother suffered severe post-traumatic stress and was in and out of depression since date of accident was affirmed): Williams v. O’Neill, 1999-2575, 1999-2576, 1999-2577 (La.App. 4th Cir.3/13/02), 813 So.2d 548, 561-562. writ denied, 2002-1029 (La.5/24/02), 816 So.2d 859, (award of $150,000 to husband for mental anguish due to complications from wife's bypass surgery affirmed on appeal).

. Evidence in the record indicates that Martinez was a citizen of Mexico and was an undocumented alien who procured employment through the use of false documents. The trial court excluded all evidence of decedent's citizenship status, ruling that status was not relevant and was highly prejudicial.

. See Bollinger Shipyards, Inc. v. Director, Office of Worker’s Compensation Programs, 604 F.3d 864, 872-873 (5th Cir.2010).

. He based this on a rate of $12 per hour for twelve to twenty-six hours per week, which he took from a dollar value for the day chart available from the U.S. Department of Labor.